John C. GRECO, Plaintiff-Appellant,

v.

ORANGE MEMORIAL HOSPITAL CORPORATION et al., Defendants-Appellees.

No. 74–2102.

United States Court of Appeals, Fifth Circuit.

May 29, 1975.

Rehearing and Rehearing En Banc Denied June 26, 1975.

James R. Weddington, Austin, Tex., for plaintiff-appellant.

John D. Rienstra, Beaumont, Tex., L. W. Anderson, Dallas, Tex., Thomas B. Weatherly, Frank C. Gibbs, Houston, Tex., Richard N. Evans, Beaumont, Tex., Bill Sexton, Orange, Tex., Cleve Bachman, Lipscomb Norvell, Jr., Beaumont, Tex., Frank W. Hustmyre, Orange, Tex., for defendants-appellees.

Don Burgess, Jim Sharon Bearden, Orange, Tex., for County Commissioner.

Before GEWIN, BELL and CLARK, Circuit Judges.

GEWIN, Circuit Judge:

The plaintiff-appellant, Dr. John C. Greco, a licensed physician authorized to practice obstetrics and gynecology, joined the staff of the Orange Memorial Hospital in 1960. In early 1973 after the United States Supreme Court invalidated the Texas criminal abortion statute, the appellant began to perform elective abortions. Eight elective abortions were performed by Dr. Greco in Orange Memorial Hospital before the hospital's board of directors adopted a motion of the medical staff to prevent further use of the hospital's facilities for the performance of non-therapeutic abortions. Following the institution of this policy six of Dr. Greco's patients who desired non-therapeutic abortions were denied admission to the hospital.

Facts stipulated by the parties indicate that surgical procedures technically indistinguishable from elective abortions are performed in Orange Memorial Hospital and that the hospital's facilities are adequate to accommodate patients seeking elective abortions. Dr. Greco filed suit against the Orange Memorial Hospital Corporation, its board of directors

and medical staff, and the Commissioners Court of Orange County, seeking declaratory and injunctive relief, as well as damages, for their allegedly unconstitutional policy. Prior to trial the district court ordered the damage claim severed and held in abeyance pending resolution of the other issues presented. The court found the board of directors ultimately responsible for hospital policy and dismissed the medical staff from the case. Subsequent to the presentation of Dr. Greco's evidence the court dismissed the remaining defendants holding that absent a showing of "state action" the court was without the subject matter jurisdiction required by 42 U.S.C. § 1983 and the Fourteenth Amendment to hear the case.[1] We agree with the district court in all respects and affirm. The opinion of the district court is reported in 374 F.Supp. 227 (E.D.Tex.1974).

Dr. Greco raises two questions on appeal: (1) whether the district court erroneously decided that the actions of the hospital staff and the board of directors did not constitute "state action", or "action under color of law"; (2) whether the district court erroneously dismissed the cause of action against the medical staff. The appellees present a cross specification of error contending that the district court erroneously found that Dr. Greco had standing to bring the suit.

■ Addressing first the question of standing, we find that in the circumstances Dr. Greco had standing to litigate on behalf of his patients who were allegedly deprived of constitutional rights by the Orange Memorial Hospital's restrictive abortion policy, and on his own behalf because of his individual economic and liberty interest. Dr. Greco's personal stake in this litigation is primarily his right to practice medicine

free from the imposition of arbitrary restraints, and the physician's interest in the context of this case is inextricably bound up with the right to privacy of the patients seeking an abortion. The existence of such a personal interest in the controversy is assurance enough of the adversarial character of the litigation necessary to sharply focus the issues for this court.[2] See Nyberg v. City of Virginia, 495 F.2d 1342, 1344 (8th Cir. 1974); Shaw v. Hospital Authority of Cobb County, 507 F.2d 625 (5th Cir. 1975); Roe v. Wade, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); YWCA v. Kugler, 342 F.Supp. 1048, 1055 (D.N.J. 1972). See generally, Standing To Assert Constitutional Jus Tertii, 88 Harv.L.Rev. 423 (1974).

The difficult questions on this appeal are those presented by Dr. Greco. He asserts essentially that Orange Memorial Hospital and Orange County are engaged in a symbiotic relationship, that Orange County has delegated its authority to the hospital corporation, and that the hospital is performing a public function, all of which indicate that the hospital should be subject to constitutional restrictions. Dr. Greco takes specific issue with the district court's construction of Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) and Doe v. Bellin Memorial Hospital, 479 F.2d 756 (7th Cir. 1973) to the effect that he must show that Orange County is involved in the very activity challenged in order to prove "state action." He argues that the evidence shows the state to be a joint participant in the operation of the private entity and that the state is perforce involved in the challenged activity.

In order to provide the proper perspective for addressing these questions we

---

1. See, Parish v. National Collegiate Athletic Association, 506 F.2d 1028, 1031 (5th Cir. 1975).

2. The district court stated its conclusion on the issue of standing as follows:

   This Court is in agreement with the reasoning of the Court in Young Women's Christian Association of Princeton, N. J. v.

Kugler, that the plaintiff physician has standing to litigate any deprivations of the constitutional rights of his pregnant women patients. Further, he has standing to litigate on his own behalf because he has suffered some, albeit small, economic loss and because the hospital rule may infringe on his right to practice medicine.
374 F.Supp. at 232.

must delve more deeply into the factual background of the Orange Memorial Hospital and, once ascertained, perceive the facts of this case in the context of the legal morass of the ever evolving state action doctrine.

The history of the hospital's creation was stipulated by the parties. In 1954 land on which the hospital is located was donated to Orange County by private individuals. In the same year county voters authorized the issuance of $1,762,000.00 in hospital bonds. The local money was combined with a Hill-Burton grant of $1,250,000.00 in order to erect the original hospital building. In later years more land was donated to the county by private individuals and the county commissioners, without the explicit approval of the voters, issued approximately $670,000.00 worth of hospital time warrants so that additions could be made to the original building. The county owns both the land and the building which houses the Orange Memorial Hospital. Orange County citizens pay eight and one-half cents of every tax dollar to retire the bonds and time warrants.

■ In 1957 Orange Memorial Hospital, under the auspices of the non-profit hospital corporation, opened its doors to the public. Daily operating expenses are assumed by the hospital corporation and paid with funds generated by the hospital's services. To-date income from patients has been sufficient to defray all expenses. The corporation leases the land and hospital building from the county for one dollar per year and is exempt from all taxation, state, local, and federal. The term of the lease between the county and the hospital corporation is for a period of 5 years, and the lease may be renewed for 5 year terms indefinitely. Under the provisions of the lease the hospital corporation agreed to the following: (1) to operate the hospital as a non-profit institution and to furnish to the general public medical and surgical care subject to such terms and regulations as the lessee may prescribe; (2) to carry out the assurances required of the lessor in order to obtain federal funds and to relinquish possession of the hospital in the event it fails to adequately comply;[3] (3) to have all equipment and supplies inventoried, in a manner approved by lessor, and to dispose of worthless, damaged, or worn out equipment only with the prior approval of the Commissioners Court; (4) to be responsible for the expense of the day to day operation and maintenance of the hospital; (5) to make additions to the hospital with the written consent of lessor and at its own expense; (6) to keep all appropriate insurance in effect; (7) to submit an annual audit to lessor and to furnish any information which lessor feels is necessary to inform the people of Orange County about the operation and financial condition of the institution; (8) to accept indigent patients certified by the lessor subject to the prior obligation to receive emergency cases. The lessee is given an option to purchase the hospital during the term of the lease and an unlimited option to renew the lease for additional 5 year periods as indicated earlier. The lessor reserves the right through its County Health Office to advise the lessee that an indigent is being kept in the hospital for a longer period of time than necessary, and that the lessor shall no longer be liable for expenses. The lessor-county specifically indicates in the lease that the lessee "has undertaken to relieve lessor of the responsibility and expense of operating a hospital."

---

**3.** The Hospital Survey and Construction Act (Public Law 725, 79th Congress) Tit. 42 U.S. C.A. § 291 et seq. provides generally for conditions upon which federal assistance is available for the construction of hospitals. For example, § 291e requires that laborers engaged in construction of the facility be paid wages not less than those prevailing on similar work in the particular locality. No condition is imposed with respect to the performance or nonperformance of elective abortions.

Federal financial assistance does not bring an otherwise private facility within the parameters of 42 U.S.C. § 1983 and the Fourteenth Amendment. See, e. g., Barrett v. United Hospital, 376 F.Supp. 791, 800–01 (S.D.N.Y.1974).

The lessee-Orange Memorial Hospital Corporation was chartered as a non-profit, tax exempt, private corporation for the purpose of supporting charitable and educational undertakings including the operation and maintenance of the hospital, and the general promotion of the health of the community. The corporation consists of life and advisory members. Life membership is obtained by contributing $1000.00 to the corporation. Any citizen and qualified voter of Orange County who owns taxable property may become an advisory member by attending the annual meetings of the corporation. The direction and management of the affairs of the corporation is vested in the board of directors composed of 9 persons. Five members of the board must be life members and four members are elected from the advisory group. The by-laws of the corporation do not precisely define the relationship between the board of directors and the medical staff but do indicate that the board is the ultimate authority in determining hospital policy. The board is authorized to receive and consider recommendations of the medical staff.[4]

The district court correctly held that a private hospital is subject to the provisions of 42 U.S.C. § 1983[5] and the Fourteenth Amendment[6] only if its activities are significantly affected with state involvement.[7] Section 1983 and the Fourteenth Amendment do not preclude invidious discrimination by private

---

**4.** For example, Article IX §§ 1, 2, 9 of the Hospital Corporation's By-Laws provide that:

SECTION 1

The Board of Directors shall appoint a Medical Staff of the Orange Memorial Hospital Corporation which shall, subject to the approval of the Board of Directors of the Corporation, adopt its own By-Laws. Such By-Laws shall not be inconsistent with the By-Laws of the Corporation, and shall include a provision for review of decisions concerning qualifications and privileges of members of the Medical Staff and applicants for membership, including the right of the individual practitioner to be heard upon request, at each step of the process.

SECTION 2

The Medical Staff shall have the authority to evaluate the professional competence of staff members, and applicants for staff membership; and shall be responsible for making appropriate recommendations to the Board of Directors concerning the appointment, reappointment, granting of privileges, and curtailment of privileges of members, and as appropriate, applicants for membership on the professional staff.

SECTION 9

The Board of Directors shall be kept informed of the recommendations generated from the Medical Staff's peer review of the clinical practice, and utilization review functions. The Chief of the Medical Staff shall be requested periodically (at regularly scheduled meetings of the Board of Directors) to provide the Board with a verbal briefing concerning these functions.

**5.** The Civil Rights Act of 1871 (42 U.S.C.A. § 1983) states in pertinent part:

Every person, who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . in an action at law, suit in equity . . . .

**6.** Section 1 of the Fourteenth Amendment states in pertinent part:

No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

**7.** Two elements must be proved in order to recover under § 1983: (1) deprivation of a constitutional right by a defendant, (2) acting under color of law. See Smith v. Young Men's Christian Ass'n of Montgomery, 462 F.2d 634, 647 (5th Cir. 1972); Hathaway v. Worcester City Hospital, 475 F.2d 701, 705 (1st Cir. 1973), and discussion of Dr. Greco's standing to bring this suit, in text, *supra*. Generally speaking the labels "state action" and "under color of law" are perceived as alternative ways of expressing the same legal principle. Note, State Action: Theories for Applying Constitutional Restrictions to Private Activity, 74 Col. L.Rev. 656, n. 4 (1974) (hereinafter cited as State Action: Theories); Parish v. National Collegiate Athletic Association, 506 F.2d 1028, 1031 n. 6 (5th Cir. 1975). Justice Brennan is of the view that "under color of law" is more restrictive than the concept of "state action." Adickes v. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, 184–85 (1970) (opinion of Brennan, J.).

parties. Civil Rights Cases, 109 U.S. 3, 11, 3 S.Ct. 18, 21, 27 L.Ed. 835, 841 (1883).[8] The problem in state action cases is that demarcation of the spheres, public and private, is a dynamic process, and the boundaries between the two shift and are adumbrated by the various factual situations which are presented for review.[9] As the Court in Burton v. Wilmington Parking Authority said, "Only by sifting facts and weighing circumstances can the nonobvious involvement of the State in private conduct be attributed its true significance."[10] It is enlightening, however, to consult the substantial body of "state action" case law for illustrations of the kind and degree of state involvement which justify the imposition of Constitutional restraints upon an ostensibly private entity.

Generally speaking, questions of "state action" arise when the state has involved itself in the activity under scrutiny or when a private entity has of its own volition assumed a state or public function. See generally, State Action: Theories; State Action, Congressional Power and Creditors' Rights; State Action and the Burger Court, 60 Va.L.Rev. 840 (1974); Case Note, 43 Fordham L.Rev. 288 (1974); The Reemergence of the "State Action" Requirement in Race Relations Cases, 22 Cath.U.L.R. 39 (1972); Developments in the Law: Academic Freedom, 81 Harv.L.Rev. 1045, 1056–64 (1968). A state's involvement may be manifested in multifarious ways. For example, the state may sanction or seek to enforce the claims of private parties,[11] may give financial assistance to private institutions,[12] may regulate the

**8.** The Civil Rights Cases not only articulate the dichotomy between state and private action, but also illustrate the confusion which sometimes arises in the analysis of state action problems regarding the question of Congressional power to legislate against private discriminatory conduct. See generally, State Action, Congressional Power and Creditors' Rights: Burke and Reber An Essay on the Fourteenth Amendment, 46 S.Cal.L.Rev. 1005, 1011 (1973) (hereinafter cited State Action, Congressional Power and Creditors' Rights). For examples of decisions discussing the scope of Congressional power see, Griffin v. Breckenridge, 403 U.S. 88, 95 S.Ct. 1790, 29 L.Ed.2d 338 (1971); United States v. Guest, 383 U.S. 745, 86 S.Ct. 1170, 16 L.Ed.2d 239 (1966).

**9.** See, e. g., James v. Pinnix, 495 F.2d 206, 209 (5th Cir. 1974); Wimbish v. Pinellas Co., Fla., 342 F.2d 804 (5th Cir. 1965). *Compare* Doe v. Bellin Mem. Hosp., 479 F.2d 756 (7th Cir. 1973) *with* Jackson v. Statler Foundation, 496 F.2d 623 (2d Cir. 1974). See generally, State Action: Theories at 656–57.

The concepts of state action developed primarily in cases involving racial discrimination. The broad pronouncements articulated by the courts in some of these decisions are in the process of being more precisely defined, particularly in litigation free from racial overtones. See, e. g., Jackson v. Metropolitan Edison Co., —— U.S. ——, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); James v. Pinnix, 495 F.2d 206, 209 (5th Cir. 1974) ("Some state involvement in the *Reitman-Moose Lodge* sense may be present here but it is simply not enough, given the nonracial nature of the case, to constitute

state action."). See also, Black, The Supreme Court 1966 Term; Foreward: "State Action", Equal Protection and California's Proposition 14, 81 Harv.L.R. 69, 70 (1967) (hereinafter cited as Supreme Court 1966 Term); State Action, Congressional Power and Creditors' Rights. *Compare,* The Reemergence of the "State Action" Requirement in Race Relations Cases, 22 Cath.U.L.R. 39 (1972).

**10.** 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45, 50 (1961).

Because the virtue of the right to equal protection of the laws could lie only in the breadth of its application, its constitutional assurance was reserved in terms whose imprecision was necessary if the right were to be enjoyed in the variety of individual-state relationships which the Amendment was designed to embrace. For the same reason, to fashion and apply a precise formula for recognition of· state responsibility under the Equal Protection Clause is an "impossible task" which "This Court has never attempted."

*Id.* (citation omitted).

**11.** See, e. g., Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948); Reitman v. Mulkey, 387 U.S. 369, 87 S.Ct. 1627, 18 L.Ed.2d 830 (1967); Brantley v. Union Bk. & Trust Co., 498 F.2d 365 (5th Cir. 1974).

**12.** See, e. g., Smith v. YMCA, 462 F.2d 634 (5th Cir. 1972); Hammond v. University of Tampa, 344 F.2d 951 (5th Cir. 1965); Grafton v. Brooklyn Law School, 478 F.2d 1137 (2d Cir. 1973).

activities of private organizations,[13] or may employ private parties to promote state interests.[14] On the other hand, the state may not be involved at all. A private party may assume a governmental character by participating in activities such as those described in Terry v. Adams[15] or Marsh v. Alabama.[16] The instant appeal involves some aspects of both state involvement and the assumption of a public function by private parties. Under neither approach do we feel that the circumstances warrant imposition of constitutional restrictions upon Orange Memorial Hospital.

■ Orange County gives the hospital corporation financial support to the extent that a publically owned building and the land upon which it is situated are leased for the nominal sum of one dollar per year. The hospital corporation is a non-profit, charitable, tax exempt, organization explicitly dedicated to maintaining the facility and to promoting community health care. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961) involved a somewhat similar but not identical situation. The Authority, in order to make bond financing of its parking facility practicable by ensuring income in addition to parking fees, entered into long term leases with commercial tenants, including the Eagle Coffee Shoppe. The Eagle Coffee Shoppe, at its own behest, adopted a policy of racial discrimination, refusing to serve blacks. The Court emphasizing the facts that the parking facility was publically owned, that the restaurant's premises constituted physically and financially integral parts of the State's parking project, that upkeep and maintenance of the building were public responsibilities, that the lease provisions enabled the

State to demand that Eagle provide non-discriminatory service, and that the restaurant was located in a building devoted to public purposes, found a degree of state participation in the Eagle's discriminatory action which was precluded by the Fourteenth Amendment.[17] The Court observed that the mutually beneficial relationship between the Authority and Eagle infused the respective projects with attributes of a joint venture.[18] Absent close scrutiny one might argue that Burton v. Wilmington Parking Authority controls the instant appeal. There are, however, significant differences in the two sets of circumstances.

The most obvious distinguishing factor is that Orange Memorial Hospital is not accused of racial discrimination. The doctrine of state action developed primarily in the area of racial discrimination. See State-Action Theories at 657 and footnote 10, supra. The concepts developed in this area, explicitly supported by constitutional and legislative mandates, were necessarily broadly drawn in order to implement Congressional intent in circumstances of positive and frequent state obfuscation and delay. The potentially explosive impact of the application of state action concepts designed to ferret out racially discriminatory policies in areas unaffected by racial considerations has led courts to define more precisely the applicability of the state action doctrine. See James v. Pinnix, 495 F.2d 206, 209 (5th Cir. 1974) and footnote 10, supra. See also Brantley v. Union Bk. & Trust Co., 498 F.2d 365 (5th Cir. 1974); Calderon v. United Furniture Co., 505 F.2d 950 (5th Cir. 1974); Derrington v. Plummer, 240 F.2d 922 (5th Cir. 1956); Blouin v. Loyola, 506 F.2d 20 (5th Cir. 1975); Grafton v. Brooklyn Law School, 478 F.2d 1137, 1142 (2nd Cir. 1973).

---

13. See, e. g., Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972); Grafton v. Brooklyn Law School, 478 F.2d 1137 (2d Cir. 1973).

14. See, e. g., Derrington v. Plummer, 240 F.2d 922 (5th Cir. 1956).

15. 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

16. 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946).

17. Burton v. Wilmington Parking Authority, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45, 51–2 (1961).

18. Id.

*Compare*, Simkins v. Moses H. Cone Mem. Hosp., 323 F.2d 959 (4th Cir. 1963), cert. denied, 376 U.S. 938, 84 S.Ct. 793, 11 L.Ed.2d 659 (1964). The policy of the Orange Memorial Hospital Corporation does not impinge upon the rights of a racial group seeking admittance and treatment, but rather affects primarily only the internal affairs of the facility. A secondary effect of the corporation's policy is admittedly to discriminate against persons seeking to obtain and physicians desiring to perform elective abortions. We feel, however, that the interest of the hospital in ordering its internal administrative affairs outweighs the interest of the people disadvantaged in this case.

A second factor distinguishing the instant situation from that described in Burton v. Wilmington Parking Authority is also noted in Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627, 638 (1972):

> [T]here is nothing approaching the symbiotic relationship between lessor and lessee that was present in Burton, where the private lessee obtained the benefit of locating in a building owned by the state-created parking authority, and the parking authority was enabled to carry out its primary public purpose of furnishing parking space by advantageously leasing portions of the building constructed for that purpose to commercial lessees such as the owner of the Eagle Restaurant.

The symbiotic relationship in Burton v. Wilmington Parking Authority included an obligation on the part of the Authority to maintain and repair Eagle's premises. In addition the Authority provided the restaurant with heat and electricity. In contrast, the Orange Memorial Hospital Corporation is ultimately responsible for the daily maintenance, upkeep, and operation of the facility. The lease requires the lessee to maintain and operate the hospital at its own expense and to hold the lessor harmless from any liability incurred in operating the facility. The lessee is required during the term of the lease to provide adequate fire, tornardo, and explosion insurance and in the event of any damage to use the proceeds to repair the hospital.

In addition to the absence of a physical relationship like the one found between the Authority and the restaurant in Burton v. Wilmington Parking Authority, there is also no showing of other "benefits mutually conferred" which allows us to characterize the hospital and the county as joint venturers. There are unquestionably indirect benefits accruing to Orange County by virtue of the corporation's operation of the hospital. As the lease states, the county is relieved of the expense and responsibility of operating a hospital. There is, however, no indication, as there was in Burton v. Wilmington Parking Authority that the benefits accruing to the county were directly attributable to the objectionable activities of a joint venturer. In *Burton* the financial success of the State's project depended at least in part upon the popularity and income of the Eagle Restaurant. The restaurant owners believed that a policy of racial discrimination was necessary in order to ensure the maximum volume of business and the Authority, in its own interest, acquiesced in this policy. In short, the intimate physical and financial relationship enjoyed by the Eagle Restaurant and the Parking Authority in *Burton* is not present in this case. The interdependence of the entities, so important to the decision in *Burton*, is absent here.

The independence of the Orange Memorial Hospital and Orange County is also reflected in the absence of a nexus between the County's involvement with the Hospital and the Hospital's abortion policy presently under scrutiny. As the court said in Doe v. Bellin Memorial Hospital, 479 F.2d 756, 761 (7th Cir. 1973):

> There is no claim that the state has sought to influence hospital policy respecting abortions, either by direct regulation or by discriminatory application of its powers or its benefits. Insofar as action of the State of Wisconsin or its agents is disclosed by the

record, the State has exercised no influence whatsoever on the decision of the defendants which plaintiffs challenge in this litigation.

In fact the lease between Orange County and the Hospital Corporation explicitly provides that the *lessee* shall prescribe the terms and regulations of medical care given in the facility. The record affirmatively shows that the county officials neither directly nor indirectly participated in the formulation of the presently disputed hospital policy. See text, *infra*. See also, Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); Moose Lodge No. 107 v. Irvis, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627, 639 (1972); Blouin v. Loyola, 506 F.2d 20 (5th Cir. 1975); Driscoll v. International Union of Op. Eng., Local 139, 484 F.2d 682 (7th Cir. 1973); Pendrell v. Chatham College, 370 F.Supp. 494 (W.D.Pa.1974).

Finally, we note that in contrast to the situation in Burton v. Wilmington Parking Authority, the Commissioner's Court of Orange County retained no power to amend the hospital corporation's decision to prohibit the performance of elective abortions. The lease explicitly provides that the

> Lessee agrees to operate the hospital situated on the above described property for the duration of this lease as a non-profit institution, and thereby furnish to the general public medical and surgical care and treatment, *subject to such terms and regulations as Lessee may prescribe.* (emphasis added)

There is no evidence that in acquiring federal funds or in leasing the hospital facility the corporation ever accepted a condition relating to the performance or non-performance of abortions. Doe v. Bellin Memorial Hospital, 479 F.2d 756, 761 (7th Cir. 1973). The Parking Authority in *Burton,* on the other hand, was specifically obligated to operate in a non-discriminatory manner.

We would be less than candid not to acknowledge Orange County's limited involvement and interest in the hospital facility. The lease does obligate the hospital corporation to serve the general public, to admit indigent patients, to abide by the provisions of the Hospital Survey and Construction Act, to provide the county auditor with a yearly financial report (and any other information requested), and to obtain county approval before disposing of hospital property. These factors are not unusual in the lessor-lessee relationship. The Court in Jackson v. Metropolitan Edison Company, 419 U.S. 345, 95 S.Ct. 449, 453, 42 L.Ed.2d 477, 484 (1974) fairly summarizes Orange Memorial Hospital's status:

> It may well be that acts of a heavily regulated utility with at least something of a governmentally protected monopoly will more readily be found to be "state" acts than will the acts of an entity lacking these characteristics. But the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself.

We do not feel that the nature of Orange County's involvement with the hospital facility justifies a finding of state action.

Dr. Greco's assertion that the instant appeal is governed by Marsh v. Alabama, 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946) and Terry v. Adams, 345 U.S. 461, 73 S.Ct. 809, 97 L.Ed. 1152 (1953) is also ill-founded. Recent decisions have more explicitly defined the applicability of *Marsh* and *Terry* stating that a business is not a state actor merely because the enterprise is affected with a public purpose. See Jackson v. Metropolitan Edison Co., 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477, 485 (1974); Central Hardware Co. v. NLRB, 407 U.S. 539, 92 S.Ct. 2238, 33 L.Ed.2d 122, 128–29 (1972); Lloyd Corp. v. Tanner, 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131 (1972). In *Marsh,* Gulf Shipbuilding Corporation held title to all the land in the "company town" and assumed the responsibilities of providing traditional municipal services, including police protection, to the residents of the town. *Terry* involved a

duplicitous county primary scheme designed to disenfranchise black voters. No such peculiarly governmental function has been assumed by the Orange Memorial Hospital Corporation. *Lloyd Corp. v. Tanner,* 407 U.S. 551, 92 S.Ct. 2219, 33 L.Ed.2d 131, 143 (1972).

In summary, we find that Orange County is not sufficiently connected with the Orange Memorial Hospital Corporation's activities to imbue those actions with the attributes of the state. The involvement of the County is not sufficiently related to the corporation's decision to prohibit elective abortions to justify the imposition of Constitutional restrictions upon the daily business of the hospital.[19] Absent a charge of racial discrimination we are disinclined to press the state action doctrine and all that it entails into the internal affairs of a hospital.[20] Moreover we do not perceive Orange Memorial Hospital as an entity exercising peculiarly governmental functions which might, in the absence of constitutional restrictions, be employed in derogation of a citizen's fundamental rights.

For the reasons stated we affirm the judgment of the district court.[21]

Affirmed.

CLARK, Circuit Judge (concurring):

Despite Judge Gewin's forceful opinion, I remain convinced that Orange County and this hospital enjoy precisely the sort of symbiotic relationship defined in *Burton.* To their mutual advantage, the county furnished land, buildings and facilities while operation and supervision by the hospital board and medical staff provided the general county community with health services and provided priority medical care for the county's indigent citizens.

However, I still come down on the side of affirming the dismissal because the particular claim asserted is not actionable. *Doe* and *Roe* teach that a state

---

**19.** We are not willing to hold that the district court erred in reaching the following conclusion:

> In the present case the Court finds that the Orange Memorial Hospital is a private hospital operated by the Orange Memorial Hospital Corporation, which is a non-profit corporation. The evidence supports the conclusion that Orange County and the State of Texas have never sought to regulate or influence the medical policy to be followed within the hospital and in particular with respect to the performance or non-performance of elective abortions therein. The County and State have remained completely neutral on the medical policy of the hospital. Therefore, there is no state action involved and the defendants were not acting under color of state law.

374 F.Supp. at 233.

**20.** In an entirely different context this court sitting en banc has recently dealt with the state action concept in *Fitzgerald v. Estelle,* 505 F.2d 1334 (5th Cir. 1975). In *Fitzgerald* a state prisoner petitioned for a writ of federal habeas corpus claiming that his state trial was unfair, that he was denied the effective assistance of counsel and that state action was involved. He buttressed his claims with the assertion that the adjudication of state criminal cases is a vital and structured function of the state. He argued that state action was involved because he was prosecuted by a state prosecutor, in a state court, before a state judge in a state courthouse before a jury selected according to state law and paid by the state. Indeed he asserted that from arrest to ultimate release he was in the hands of a state operated system and that even his privately retained counsel was a crucial part of the state adjudicatory machinery. These facts were undisputed. We succinctly concluded:

> [the] conclusion that the Fourteenth Amendment state action requirement is satisfied in every ineffectiveness of retained counsel case "because the state adjudicatory machinery is inextricably intertwined with the conduct of an accused person's retained attorney" reaches far too far.

505 F.2d at 1337.

The complaint of Dr. Greco is important and we have tried to give his arguments and allegations careful consideration. However, all of his assertions relate only to his alleged right to conduct a certain type of surgical procedure at one specific hospital. On the other hand, Fitzgerald's petition for the Great Writ presented an appealing plea for liberty which had been abridged by a state prison sentence confining him to a state prison for a substantial number of years. The claims of Dr. Greco are not nearly so ominous as those of Fitzgerald.

**21.** Dr. Greco's contention that the medical staff was improperly dismissed from the suit is, therefore, moot.

cannot forbid certain types of abortions, but they do not create any duty on Orange County's part to furnish facilities for such operations. Just as the Eagle Coffee Shop in Wilmington's parking garage could not have been forced to furnish kosher food or serve fish on Friday, so the Orange County Hospital cannot be compelled to allow its facilities to be used for elective abortions. *Contra,* Doe v. Hale Hospital, 500 F.2d 144 (1st Cir. 1974), and Nyberg v. City of Virginia, *supra.*