Gene ALBRIGHT and Bettie J. Page, Plaintiffs–Appellees,

v.

The LONGVIEW POLICE DEPARTMENT, etc., et al., Defendants,

The Good Shepherd Hospital, Inc. d/b/a Good Shepherd Medical Center and The Board of Trustees of Good Shepherd Hospital, Inc. Defendants–Appellants.

Nos. 88–2843, 88–2895.

United States Court of Appeals, Fifth Circuit.

Oct. 2, 1989.

J. Richard Cheney, Wood Lucksinger & Epstein, Houston, Tex., Hugh M. Smith, Glen Rose, Tex., for defendants-appellants.

Larry R. Daves, Daves, Hahn & Levy, San Antonio, Tex., for plaintiffs-appellees.

Before GARWOOD, JONES, and SMITH, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Gene Albright filed suit under 42 U.S.C. § 1983 for damages resulting from his termination as Personnel Director of Good Shepherd Hospital, Inc. and his arrest by the Beaumont, Texas, Police Department for distributing leaflets on hospital proper-

ty. The district court consolidated Albright's action with claims by Bettie J. Page, who sued under state law, 42 U.S.C. § 1981 and Title VII to redress her alleged termination by Good Shepherd Hospital. Judgment was entered favorably to plaintiffs. Finding that the district court erred in concluding that Good Shepherd Hospital was a state actor under civil rights law, we reverse in part, vacate in part and remand the case as to Albright. We affirm the judgment in favor of Page.

## BACKGROUND

Gene Albright was personnel director at Good Shepherd Hospital, Inc. ("Good Shepherd") until he was fired on June 5, 1985. Albright alleged that he was discharged in retaliation for protesting to the hospital administration various alleged violations of hospital policies and for assisting a group of nurse supervisors, including plaintiff Page, with their grievances against the hospital administration.

A week after his termination, Albright attempted to hand out to hospital employees leaflets discussing the circumstances of his discharge. In a short while, a hospital security guard informed Albright that he was violating a hospital policy prohibiting solicitation or distribution of literature by non-employees on hospital grounds. The guard warned that if Albright did not desist and leave the hospital premises, he would be arrested. The warning went unheeded and Albright was arrested. He was released after the hospital declined to press charges against him.

Addressing Albright's numerous claims for relief, the jury found as follows: First, the hospital summoned the Longview police to arrest Albright for distributing leaflets on hospital grounds, and this decision was motivated by a desire to suppress his unfavorable opinions. Second, the defendants
> caused the police officer to arrest [Albright] by knowingly and willfully furnishing false information to that officer.

Third, although Albright proved that he discussed various grievances and concerns about racial discrimination with the hospital administration and nurses, the jury did not find that he was fired for that reason. Fourth, Albright had an employment agreement that provided he would not be discharged so long as his job performance was satisfactory. Fifth, specific procedures existed to govern the hospital's decision to fire Albright. In connection with the fourth and fifth interrogatories, the jury found that Albright
> was discharged from his employment at the hospital in violation of established hospital policies or procedures or of his employment agreement.

Over the objection of Good Shepherd, the district court instructed the jury that the hospital was an instrumentality of Gregg County and was acting under color of state law, for purposes of the civil rights laws, in its actions toward Albright. The jury assessed his actual damages at $250,000, added $1.00 nominal damages for violation of his constitutional rights and then added $100,000.00 in punitive damages.

Page, a black female, began her career with Good Shepherd in 1973 as a graduate nurse. Page progressed from staff nurse to head nurse in 1976 and to clinical nurse supervisor in 1979. According to Page, a crisis of morale among the Good Shepherd nursing staff led to the retaliatory action taken against her. Morale had declined because the vice-president of nursing hired a white friend from the outside as nursing director rather than promoting Page or her black co-supervisor.

Page injured her shoulder during the summer of 1985, but she continued working through January, 1986, when she underwent surgery. During her recuperation, the hospital promoted another nurse to fill her position. In May 1986, Page's doctor released her to work so long as she avoided lifting. Upon her return to work, Page was advised that no supervisory position was available. The vice-president of nursing offered her only a floor position, and Page eventually obtained a position as a charge nurse. Her responsibilities were similar to those of a supervisor, but the salary was lower.

Page accordingly brought suit under 42 U.S.C. § 1981 and Title VII, alleging intentional racial discrimination. The district court found in her favor and awarded over $20,000 in back-pay, reinstatement, and accommodations at work for her shoulder injury. Page also sued on the state law claim that she was discriminated against for filing a worker's compensation claim. The jury returned a verdict in her favor for $120,000 actual and $40,000 punitive damages.

## THE ALBRIGHT CLAIMS

The first issue critical to sustaining Albright's judgment is whether the hospital, which contracted to operate and manage a facility built and owned by Gregg County, was a "state actor" for purposes of Section 1983. The district court instructed the jury that state action was present:

> [F]or the purposes of the Plaintiff's Fourteenth Amendment and § 1983 claims, the Defendants Good Shepherd Hospital and the Board of Trustees of Good Shepherd Hospital are considered to be instrumentalities of the State of Texas and were acting at all times "under the color of law."
>
> You are reminded again that, as a matter of law, the defendants are deemed to have been acting "under the color of law" for all purposes relevant here.

The court's principal reason for this conclusion was "[t]he close nexus here ... between the private management of the hospital and the county's financial and other benefit[s]." We review the court's state action determination independently on appeal, since the question is a mixed one of law and fact.[1] See Pullman Standard v. Swint, 456 U.S. 273, 287–88 n. 16, 102 S.Ct. 1781, 1789 n. 16, 72 L.Ed.2d 66 (1982).

Whether the conduct of private parties such as Good Shepherd is state action depends upon the specific facts and circumstances surrounding the challenged action. See Burton v. Wilmington Parking Authority, 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961); Barnes v. Lehman, 861 F.2d 1383, 1385 (5th Cir.1988). As the Supreme Court recently explained in National Collegiate Athletic Association v. Tarkanian, — U.S. —, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988), the typical case raising a state action issue involves a private party's decisive step allegedly causing constitutional harm to the plaintiff, "and the question is whether the state was sufficiently involved to treat that decisive conduct as state action." 109 S.Ct. at 462. Several distinct lines of doctrine have been used to demonstrate sufficient state involvement or "nexus." The state may create a legal framework that governs the conduct. See, e.g., Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982); North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). Alternatively, a state may delegate its traditional powers to private actors, or it may establish a "symbiotic interrelationship" with a private entity. See, e.g., West v. Atkins, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988).

Albright's claim tracks this last line of doctrine. He contends that the "symbiotic interrelationship" between Good Shepherd and Gregg County imbues the hospital's decisions with state action. Twice before we have considered similar state action questions involving county-owned, privately run hospitals, with differing results. See Greco v. Orange Memorial Hospital Corp., 513 F.2d 873, 882 (5th Cir.), cert.

---

1. We note, however, that one panel of this circuit has held that whether the relationship between the state entity and the private agency is sufficiently close is an issue of fact, subject to the clearly erroneous rule. See Howard Gault Co. v. Texas Rural Legal Aid, Inc., 848 F.2d 544, 552 (5th Cir.1988). Nevertheless, that panel, finding the case unique, undertook an independent review of the issue. Id. at 554. Most state action cases present unique circumstances; hence, they require not only factual findings, but interpretation and application of evolving Supreme Court precedent. The better view would seem to be that in those cases not obviously controlled by a previous case, the issue is one mingling law and fact. In any event, the evidence here is insufficient to support the conclusion that the hospital was a state actor. Accordingly, we need not determine whether the state actor issue, to the extent, if any, that it is one of fact, should be determined by the judge or the jury.

*denied,* 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975), and *Jatoi v. Hurst–Eu-less–Bedford Hosp. Auth.,* 807 F.2d 1214 (5th Cir.1987) mod. on other grounds and reh. en banc denied, 819 F.2d 545 (5th Cir. 1987).[2] Resolving the state action question here turns on the weight and applicability of these two competing, but not conflicting precedents. Of the two cases, Good Shepherd cites *Greco* in its behalf while *Jatoi* anchors Albright's argument. We discuss each in turn.

### A. *Greco.*

In *Greco,* a physician who performed abortions sought the district court's declaration that the hospital's new policy of refusing to allow elective abortions to be performed in its facilities was unconstitutional. Our court upheld the district court's denial of relief, concluding that no state action was present. Dr. Greco relied primarily upon *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), in which the Supreme Court held that the Eagle Coffee Shoppe's refusal to serve blacks constituted state action in part because the coffee shop was located within, and paid rent to, the City's parking garage facility.

The *Greco* panel found *Burton* distinguishable on two grounds, the first and most obvious being that the hospital was not accused of racial discrimination. Hence, the *Greco* court recognized the maxim that state action is much more likely to be found when racial discrimination is involved. The court explained that:

> The potentially explosive impact of the application of state action concepts designed to ferret out racially discriminatory policies in areas unaffected by racial considerations has led courts to define more precisely the applicability of the state action doctrine.

513 F.2d at 879. The second reason for distinguishing *Burton* was that the relationship between the county and the hospital did not have the requisite "symbiotic

character." *See Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). As *Greco* explains, such a relationship is not created merely by a lessor/lessee arrangement but must also involve other benefits mutually conferred. Specifically, there must be some indication that the benefits flowing to the county were directly attributable to the objectionable activities of a joint venturer. *Greco* found that the county received no direct benefit from the hospital's refusal to allow the doctor to perform elective abortions. The court observed that in *Burton,* by contrast,

> the financial success of the State's project depended at least in part upon the popularity and the income of the Eagle Restaurant. The restaurant owners believed that a policy of racial discrimination was necessary in order to ensure the maximum volume of business and the Authority, in its own interest, acquiesced in this policy.

*Id.* at 880.

*Greco* considered six specific aspects of the hospital-county relationship in determining whether that relationship was sufficiently close to create state-action:

1. Financial support was given to the hospital by the county in the form of a nominal rent charge;

2. The plaintiff was not complaining of racial discrimination;

3. The county was in no way responsible for the daily operating expenses of the hospital;

4. No benefits accruing to the county were directly attributable to the hospital's objectionable activities;

5. No county officials directly or indirectly participated in the formulation of the disputed hospital policy; and

6. The county had no other input into the day-to-day activities of the hospital.

513 F.2d at 879–81. The court concluded that these factors in the county-hospital

---

**2.** *Cert. denied sub nom. Harris Methodist H–E–B Board of Trustees v. Jatoi,* 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988).

relationship taken together dictated a finding of no state action.

### B. *Jatoi.*

Albright argues, however, that his case more closely resembles *Jatoi* than *Greco*. Dr. Jatoi, born in Pakistan and of East Indian origin, sued the defendant hospital authority, the medical board, and the trustees under 42 U.S.C. § 1983, alleging that they discriminated against him by terminating his medical staff privileges on the bases of his national origin. Jatoi alleged that the termination procedures denied him due process. The district court granted summary judgment on the ground that there was no state action, relying upon *Madry v. Sorel*, 558 F.2d 303 (5th Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), which, in turn, had relied heavily upon *Greco*.

Our court reversed, returning to *Burton* to distinguish *Greco* and *Madry*. The key difference identified by the opinion was that the hospital authority "derived a direct financial benefit from its lessee" since the authority's repayment of bonds it issued and mortgages it entered into were dependent on the successful operation of the hospital. 807 F.2d at 1221. Hence, in *Jatoi*, as opposed to *Greco*, the lessor/public authority and the lessee/hospital were intertwined in a financially interdependent relationship.

Thus, the panel in Jatoi concluded that the county-hospital relationship more closely resembled the "joint venture" arrangement in *Burton* in which the actions of the private party in furthering that joint venture were suffused with the state's authority. Additional points of similarity between *Jatoi* and *Burton*, the panel observed, were that the public owned the facilities and had constructed the hospital with public funds; the hospital authority was lessor and continued to finance the hospital through bonds, mortgages, and local fundraising; and the hospital authority, like the Wilmington Parking Authority, was a public corporation designed to perform a public purpose.

### C. *Good Shepherd's Status as a State Actor.*

Although but a fine line separates *Greco* from *Jatoi*, we conclude, contrary to the decision of the district court, that the former decision carries greater precedential weight in the circumstances present here. Hence, there is not a sufficient nexus between the county and Good Shepherd to justify a finding that Good Shepherd acted under the color of state law for the purposes of Albright's § 1983 claims.

The district court determined that *Jatoi* bore the greater similarity to this case because in both cases the public authorities monitored the private management of the hospital and had authority over major decisions. While we agree that important similarities exist between this case and *Jatoi*, there are also dispositive differences. Of major significance is the fact that the relationship between the hospital and the county in *Jatoi* was marked by the presence of a functional intermediary; namely, the hospital authority. The authority was a specially-created government entity which existed for the purpose of overseeing the hospital's activities. Here, however, no such functional intermediary was present in the relationship between Gregg County and Good Shepherd. Its absence makes a critical difference in that it removes the County one organizational step from the activities and operations of the hospital.

The distinction between *Greco* and *Jatoi* created by the presence of the hospital authority in *Jatoi* is made particularly poignant by that court's express recognition of the fact that "[a]lthough the Authority had no direct input on the day-to-day operation of the hospital, it was informed of decisions, *including the decision to terminate Dr. Jatoi's privileges.*" 807 F.2d at 1221 (emphasis added). Here, Gregg County was never "informed" of Albright's termination, nor did the County have any right to such information. In *Jatoi*, however, this information involved the hospital authority in the very constitutional infringement that formed the basis for Dr. Jatoi's suit. Such knowledge by the County could be deemed tacit accept-

ance of the hospital's alleged racial discrimination against Dr. Jatoi and also provides the necessary link for a finding of state action, that is, "that the alleged infringement of federal rights is fairly attributable to the state." *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2770, 73 L.Ed.2d 418 (1982). Moreover, in *Jatoi*, we concluded that the authority "retained the ability to prevent or control" the complained of conduct, 807 F.2d at 1221, while the evidence here does not suggest such a finding as to the county.

The degree of closeness between the hospital and the county in *Jatoi* is also evidenced by the fact that the hospital authority actually owned the hospital operations at the time the discriminatory acts against Dr. Jatoi occurred. It was not until after the litigation had begun that the hospital authority sold the hospital operations. 807 F.2d at 1221.

■ Thus, we are persuaded to apply the rule of *Greco* to the circumstances here. In *Greco*, as in the instant case, the hospital was operated by a private, non-profit, tax-exempt corporation organized by local residents for the purpose of leasing and operating the hospital. Also like the present case, the only functional interrelationship that existed between Orange County and the corporation leasing the hospital in *Greco* was the lease agreement. Indeed, a number of the lease provisions in *Greco* are similar to the provisions in the lease between Gregg County and Good Shepherd, including provisions containing the hospital's assurances that it would take steps necessary to secure federal funding; make additions to the hospital's exterior only with the written consent of the County; submit an annual audit; and accept County-certified indigent patients. These general assurances, however, were not sufficient to confer state action status upon the hospital's acts in *Greco*. They are similarly impotent here.

Finally, the district court relied upon the fact that, unlike the lessee in *Greco*, Good Shepherd pays a significant amount of rent to Gregg County. But that distinction, standing alone, will not establish the requi-

site symbiotic interrelationship. The relationship is fundamentally dissimilar from that envisioned by the *Burton* Court. In *Burton*, the Court recognized that the Eagle Coffee Shoppe, and the public authority through it, benefitted from its discriminatory policies. *Burton*, 365 U.S. at 724–25, 81 S.Ct. at 861–62. No such benefit is present here, especially in light of the fact that Albright's termination was a single occurrence, and not the result of a policy whose continued practice could, through its overt character, eventually be attributed to the County. Further, seizing one detail in a complex relationship runs counter to the Court's admonition in *Burton* to "sift and weigh all the factors" to determine whether an entity is acting under the color of law. We conclude, therefore, that Good Shepherd's termination of Albright was not state action for the purpose of this section 1983 claim.

### D. *The Verdict as to Albright.*

■ As we have concluded that Albright's verdict may not stand to the extent it rests on Good Shepherd's status as a state actor, the next question is how much of the verdict requires reversal. The jury found the hospital liable for suppressing Albright's speech by having him arrested, for supplying false information to the police, and for denying his due process rights when it fired him. The first and third claims must fall: a private actor can not actionably suppress first amendment rights nor violate the due process clause.

The second claim leaves us bewildered. Both the fourth amendment and Texas state law render actionable under certain circumstances the willful supplying of false information to trump up an arrest. Under the fourth amendment, Good Shepherd could be liable, if it was a state actor, for causing Albright's arrest without probable cause. *See, e.g., Thomas v. Kippermann*, 846 F.2d 1009, 1011 (5th Cir.1988) (per curiam); *Wheeler v. Cosden Oil and Chemical Co.*, 734 F.2d 254, 260 (5th Cir.1984). Alternatively, even as a private actor, the hospital becomes liable for damages if it acted in concert with arresting public offi-

cials. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152, 90 S.Ct. 1598, 1605, 26 L.Ed.2d 142 (1970); *see also Howard Gault Co. v. Texas Rural Legal Aid, Inc.*, 848 F.2d 544, 555 (5th Cir.1988) ("private parties cannot be considered state actors merely because they invoke a state statute"). The state law of false arrest could support a verdict for Albright on the propounded jury interrogatory even if the hospital is neither a state actor nor a conspirator with state actors. *See Dupree v. Piggly Wiggly Shop Rite Foods Inc.*, 542 S.W.2d 882, 889 (Tex.Civ.App.—Corpus Christi 1976, writ ref'd n.r.e.) (Piggly Wiggly store held liable for false arrest caused by private security guards who were agents of the store); *Armstead v. Escobedo*, 488 F.2d 509, 511 (5th Cir.1974) (private party can incur liability if it actually directs police to make the arrest). Albright seems to have two legs to stand on after our rejection of Good Shepherd's status as a state actor: either the "in concert with" liability under § 1983, or pendent state law false arrest liability.

Our bewilderment stems from the fact that Albright has argued before us only the "in concert with" basis for upholding his verdict. Neither the jury interrogatories, however, nor the court's charge, nor most importantly, the evidentiary record supports this theory. Albright has failed to adduce any evidence that Good Shepherd conspired with the Longview police to arrest Albright falsely. The record reveals instead that Good Shepherd reported Albright's conduct as trespassing, and the police, not illegitimately, assumed its charge was correct. *See Bodzin v. City of Dallas*, 768 F.2d 722, 725 (5th Cir.1985) (officers could rely on complainant's claim that property was private and plaintiff was trespassing).

■ We are led to question, therefore, whether it is appropriate to sustain a $250,-001 award, plus punitive damages, on a state law false arrest claim which is not presented to us as an alternate ground of recovery for Albright. For two reasons we answer in the negative and remand for the trial court to reassess the verdict. First, it may be that Albright argues solely the "in concert with" basis for liability because Good Shepherd, whose burden it is to frame the issues for appeal, attacks only the portion of the verdict in which the hospital was deemed to be a state actor. Indeed, in its briefs Good Shepherd does not attack the damage award separately from the finding that as a state actor it had violated section 1983. The purpose of Albright's conspiracy argument would then be to uphold the jury verdict as a § 1983 violation in another mold.

An alternative possibility, however, is that Albright neglected at trial to pursue a pendent state claim for false arrest against Good Shepherd, in which case he may have waived that ground for recovery. We have perused his last amended complaint, the pretrial order, and the jury charge and remain unable to state with certainty whether Albright's false arrest claim was presented only as a constitutional claim or also as a pendent state law claim.[3] Lending credibility to the possibility that Albright did not sue under state law is the fact that Good Shepherd's brief focuses entirely on the section 1983 issues. The district court is in a much better position to determine what claims were actually raised and litigated by Albright. We therefore remand for the district court to consider whether Albright may recover for a state law tort of false arrest.

The second reason for remanding lies in the ambiguity of the jury's damage award. If Albright may recover on a state-law based false arrest claim, the $250,001 award of actual damages mixes both the vacated claims for his discharge with those for false arrest. The $1.00 nominal damages for violation of constitutional rights must fall with the determination that Good Shepherd is not a state actor. More importantly, we are unable to separate the mental anguish and other damages claimed for false arrest from the lost wages and dam-

**3.** Good Shepherd did not assert before us the insufficiency of the evidence to support the interrogatory answer that it willfully supplied false information to the Longview police. This question is therefore waived, and the jury answer will remain intact on remand.

ages solely attributable to his discharge. In such an event a new trial on damages is required. *Memphis Community Sch. Dist v. Stachura,* 477 U.S. 299, 312, 106 S.Ct. 2537, 2545–46, 91 L.Ed.2d 249 (1986) (when damage instruction is faulty and verdict does not reveal the means by which the jury calculated damages reassessment of damages is necessary); *Auster Oil & Gas, Inc. v. Stream,* 835 F.2d 597, 603 (5th Cir.1988) (same). Further, inasmuch as we must vacate the award of actual damages, it is prudent to vacate the punitive damage award for retrial. *See Crossland v. Canteen Corp.,* 711 F.2d 714, 726 n. 12 (5th Cir.1983). We emphasize again, however, that a retrial on damages will be necessary only if the court finds Good Shepherd liable for a state law false arrest violation.

## THE PAGE CLAIMS

Page won a jury verdict on the ground that she had been retaliated against for having filed a worker's compensation claim, and she won a bench verdict on her section 1981 and Title VII claims. The defendants argue that there is insufficient evidence to uphold the jury verdict and that the district judge erred in his interpretation of the retaliatory discharge law, Tex.Rev. Civ.Stat.Ann. art. 8307c (Vernon Supp. 1989).[4] They further contend that this statute does not require an employer to hold a job open for an unlimited time, nor does it require an employer to make special accommodations for injured employees who want to return to work.

■ Texas courts, however, in interpreting article 8307c, have held that "the clear intent of the statute is that an employer may not use the filing of a Worker's Compensation claim as a reason to discharge or otherwise discriminate against an employee even if there are other reasons." *Santex Inc. v. Cunningham,* 618 S.W.2d 557, 559 (Tex.Civ.App.—Waco 1981, no writ). The record contains ample evidence from which the jury could conclude that Page's termination was motivated in part by the fact that she had filed a worker's compensation claim. For instance, accommodations were made for Page's replacement when the replacement hurt her leg in a car accident and could not perform a nurse's usual ambulatory duties. There was also testimony that when Eberly was removed from her job as director of nursing, the administration created a new supervisory position that did not require any lifting. The jury could infer at least that Page was not treated the same as were other employees who were injured or sustained disabilities.

Further, Page presented to the jury a memo from Rice, Vice–President of Nursing, to Mary Hess, who was in charge of monitoring compensation claims, criticizing the personnel department for not taking action against claimants "with suspected back injuries who are border-line employees." That memo prompted a response to the effect that the worker's compensation law prohibited discriminating against injured employees. Page testified that Rice had previously ordered Page to fire employees who had sustained injuries on the job. Finally, the testimony indicated that there was substantial animus between Page and Rice, which resulted in large part from Rice's having hired her friend Eberly as director of nursing. In this context, the facts presented to the jury were sufficient to have created a conflict in substantial evidence.

Defendants also assert that Page was never actually terminated from her joB. However, Page presented the testimony of payroll supervisor Mattie Jones, who said

4. Article 8307c provides in relevant part:

Section 1. No person may discharge or in any other manner discriminate against any employee because the employee has in good faith filed a claim, hired a lawyer to represent him in a claim, instituted, or caused to be instituted, in good faith, any proceeding under the Texas Workmen's Compensation Act, or has testified or is about to testify in any such proceeding.

Section 2. A person who violates any provision of Section 1 ... shall be liable for reasonable damages suffered by an employee as a result of the violation, and an employee discharged in violation of the Act shall be entitled to be reinstated to his former position. The burden of proof shall be upon the employee.

she received a list of terminated employees from the personnel department in March 1987 and Page's name was on that list. In addition, several witnesses testified that Page had been permanently replaced.

With respect to Page's Title VII and 42 U.S.C. § 1981 claims, the defendants challenge the court's reliance on the jury's finding that Good Shepherd discriminated against Page and object to the admission of two items of testimonial evidence.

The jury was told to answer Special Interrogatory "B":

Did the plaintiff [Page] prove that the defendants discriminated against her by failing to restructure her position, as they allegedly had in the past, in such a manner that she could perform it in light of her medical disabilities?

The jury responded affirmatively. The trial court purported to rely on this finding as one basis for its conclusion that Page was discriminated against because she was black. Defendants argue that because "discrimination" was not defined in the charge as racial discrimination, the jury interpreted it to mean discrimination against persons who had filed worker's compensation claims. Defendants' argument is enhanced by a related jury interrogatory which asked whether Page was discharged or not re-employed because she filed a worker's compensation claim.

 Even if this is true, however, the district court specifically found, independently of the jury's determination, that the hospital's refusal to reinstate Page was racially motivated. Such a finding is not inconsistent with a jury finding that the hospital also discriminated against Page because she had filed a worker's compensation claim. The court did not rely solely upon the jury's verdict, and its independent finding is supported by evidence of racial incidents and slurs about Page and other blacks at the hospital.

With respect to evidence of past racial discrimination and certain incidents involving Page, we are not persuaded that district court abused its discretion in admitting such evidence. *See Johnson v. Chapel Hill Independent School District*, 853 F.2d 375, 380 (5th Cir.1988). The district court carefully detailed the independent evidence supporting equitable relief for Page. Since the record supports the court's findings, and these findings were consistent with that of the jury, it does not appear that the introduction of the evidence concerning past discrimination prejudiced the defendants.

Finally, the defendants complain that the award of punitive damages to Page was improper. Inasmuch as they admit that they failed to object to the punitive damages instruction prior to submission of the issue to the jury, appeal on the issue is foreclosed. Fed.R.Civ.P. 51. In any event, punitive damages could properly be awarded as part of Page's claim pursuant to Art. 8307c. *Carnation Co. v. Borner*, 610 S.W.2d 450 (Tex.1980).

### CONCLUSION

We accordingly REVERSE in part, VACATE in part and REMAND the judgment as to plaintiff Albright and AFFIRM the judgment as to plaintiff Page.