Thomas C. COLE, Jr., M.D., Thomas C. Cole, Jr., M.D. P.A., and Dorothy Cole, Appellants,

v.

HUNTSVILLE MEMORIAL HOSPITAL, Ralph E. Beaty, William L. Nix, M.D., HCA Management Company, Methodist Retirement Services, Inc., Joe Helms, Chester Freeman, Jr., David Knuth, M.D., Nathan W. Colwell, M.D., Michael C. Deberardinis, M.D., James M. Hanna, M.D., Robert L. Hart, M.D., R. Carl Mahaffey, M.D., J. Stan Hines, M.D., Susan E. Nelson, M.D., Howell Towler, M.D., Paul Vilardi, M.D., and Lawrence H. Wells, M.D., Appellees.

No. 01–93–00085–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Feb. 15, 1996.

Clinard J. Hanby, Houston, for appellants.

Keith S. Dubanevich, John F. Kapacinskas, Houston, William L. Durham, Huntsville, Robert T. Cain, Jr., Kenzy D. Hallmark, Lufkin, Deanna H. Livingston, Houston, Larry G. Black, Austin, Kathleen Quiroz, San Antonio, for appellees.

## OPINION

COHEN, Justice.

Appellants, Dr. Cole, his professional association, and his wife, Dorothy Cole (collectively, the Coles), appeal from a take-nothing judgment. The Coles contend the trial court erred by granting summary judgment in favor of Huntsville Memorial Hospital (the Hospital) and by striking their pleadings against the remaining appellees. We affirm.

### Facts

In 1987, the Hospital's executive committee recommended to the board of trustees that Dr. Cole's medical staff privileges be denied. After the Hospital notified Cole of its recommendation, Cole demanded that the recommendation be withdrawn and requested a hearing. Cole then filed this lawsuit against the Hospital. Cole sought an injunction, claimed the Hospital violated his right to due process, and sought damages under the Texas Medical Practice Act, TEX.REV.CIV. STAT.ANN. art. 4495b (Vernon Pamph.1996), and the Hospital Licensing Act, TEX.HEALTH & SAFETY CODE ANN. § 241.101(c) (Vernon Supp.1996). The parties agreed that the Hospital would consider Cole's request for privileges for 1988, and Cole remained on the Hospital's staff.

The executive committee recommended against Cole's reappointment for 1988. In a mandamus proceeding, the court of appeals abated the lawsuit until Cole exhausted his administrative remedies. *See Huntsville Mem. Hosp. v. Ernst,* 763 S.W.2d 856 (Tex. App.—Houston [14th Dist.] 1988, orig. proceeding). During this time, Cole remained on the Hospital's staff.

In 1989, the executive committee again recommended that Cole's reapplication for staff privileges for 1990 be denied. The Hospital notified Cole of the committee's decision and his right to a hearing. The committee provided Cole with a statement of grounds for denying his reappointment: (1) his continued pattern of inappropriate and unprofessional conduct; (2) his continued pattern of inappropriate use of inpatient, diagnostic, and ancillary services; (3) ongoing concerns about his clinical judgment and competence; and (4) the adverse financial impact on the Hospital caused by his patient care management and failure to abide by Hospital peer review recommendations.

Cole requested a hearing, After one postponement at Cole's request, a three-day hearing was held on March 28–30, 1990. The hearing panel unanimously upheld the rec-

ommendation of the executive committee. Cole requested appellate review of the panel's decision. The appellate review panel unanimously recommended that the decision of the hearing panel be upheld. On June 28, 1990, the board of trustees voted not to renew Cole's medical staff privileges. Cole then reasserted his original claims against the Hospital.

In 1989, the Coles sued twelve physicians, two corporations, and three other individuals (collectively, the Doctors). This second suit, which was consolidated, related to attempts to deny Cole's privileges at the Hospital and at Community Methodist Retirement Home. The Coles claimed damages for libel, slander, tortious interference, and antitrust violations.

The trial court granted the Hospital's summary judgment. At a later hearing to enforce sanctions for discovery abuse, the trial court struck the Coles' pleadings against the Doctors and entered final judgment.

## The Summary Judgment

In point of error two, Cole contends that the trial court erred by granting the Hospital's motion for summary judgment. He asserts that (1) fact issues exist as to whether the Hospital violated his due process rights, (2) the motion for summary judgment did not address his due process cause of action under the Texas Constitution, (3) the motion for summary judgment did not address his first amendment cause of action, and (4) the trial court erred in finding no private cause of action exists under the Texas Medical Practice Act and the Hospital Licensing Act.

## Summary Judgment Standard of Review

■ Summary judgment is proper only when a movant establishes that no genuine issue of material fact exists, thereby entitling the movant to judgment as a matter of law. *Lear Siegler, Inc. v. Perez*, 819 S.W.2d 470, 471 (Tex.1991). A defendant is entitled to summary judgment if the evidence disproves as a matter of law at least one element of each of the plaintiff's causes of action. *Marchal v. Webb*, 859 S.W.2d 408, 412 (Tex. App.—Houston [1st Dist.] 1993, writ denied). In reviewing the summary judgment, we must indulge every reasonable inference in favor of the nonmovant and resolve any doubts in its favor. *Id.*

## Objections to Summary Judgment Evidence

■ The Hospital objected to Cole's summary judgment evidence, two affidavits, and now reasserts its objections. The Hospital did not secure a ruling on its objections; therefore, nothing is preserved for review. *Fox Elec. Co. v. Tone Guard Sec., Inc.*, 861 S.W.2d 79, 81 (Tex.App.—Fort Worth 1993, no writ).

## Is the Hospital's Action "State Action" under the Fourteenth Amendment and 42 U.S.C. § 1983?

In its cross-point, the Hospital contends that the trial court properly granted summary judgment but incorrectly ruled that the Hospital is a state hospital and therefore subject to 42 U.S.C. § 1983 and the fourteenth amendment. Because the issue was considered and decided by the trial court and is dispositive of several claims, we consider it first. *See State Farm Fire & Cas. Co. v. S.S.*, 858 S.W.2d 374, 380–82 (Tex.1993).

■ The due process clause of the fourteenth amendment does not apply to private conduct. *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 349, 95 S.Ct. 449, 453, 42 L.Ed.2d 477 (1974). Similarly, under 42 U.S.C. § 1983 (1988), the defendant must have acted under color of state law. *Wong v. Stripling*, 881 F.2d 200, 202 (5th Cir.1989); *Mitchell v. Amarillo Hosp. Dist.*, 855 S.W.2d 857, 864 (Tex.App.—Amarillo 1993, writ denied). If a defendant's conduct constitutes state action under the fourteenth amendment, it is also state action under section 1983. *Rendell–Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 2769–70, 73 L.Ed.2d 418 (1982); *Mitchell*, 855 S.W.2d at 864. Thus, the issue is whether the Hospital's act is "fairly attributable to the State." *Kohn*, 457 U.S. at 838, 102 S.Ct. at 2770. If not, the Coles have no claim under section 1983 or the United States Constitution.

■ A private entity may be deemed a state actor when it performs a function that

is traditionally the State's exclusive province. *Wong*, 881 F.2d at 202. Obviously, operating a hospital is not such a function. Alternatively, state action may be found where there is a nexus between the state and the private defendant that makes the action fairly attributable to the state. *Id.* The purpose of the nexus requirement is "to assure that constitutional standards are invoked only when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains." *Blum v. Yaretsky,* 457 U.S. 991, 1004, 102 S.Ct. 2777, 2786, 73 L.Ed.2d 534 (1982).

Several Fifth Circuit cases have discussed whether a hospital's actions could be attributed to the state. *Albright v. Longview Police Dept.,* 884 F.2d 835, 841 (5th Cir.1989); *Jatoi v. Hurst–Euless–Bedford Hosp. Auth.,* 807 F.2d 1214, 1220–22 (5th Cir.1987), *cert. denied,* 484 U.S. 1010, 108 S.Ct. 709, 98 L.Ed.2d 660 (1988); *Greco v. Orange Memorial Hosp. Corp.,* 513 F.2d 873, 877, (5th Cir.), *cert. denied,* 423 U.S. 1000, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975). In each, the defendants were nonprofit corporations that leased hospital facilities from the county and were responsible for their own daily operation. *Id.* at 876.

In *Greco,* the Fifth Circuit considered six factors in concluding that there was no state action. First, the claims against the hospital did not involve racial discrimination. 513 F.2d at 879. Second, financial support was given to the hospital by the county in the form of a nominal, one-dollar-per-year rent charge. *Id.* at 880. Third, the hospital was ultimately responsible for the operation of the facility under its lease with the county. *Id.* Fourth, there was no showing of any benefits conferred on the county directly attributable to the objectionable activity. *Id.* Fifth, there was no nexus between the county's involvement with the hospital and the disputed action. *Id.* Sixth, the county had no power to change the hospital's decision nor did it directly or indirectly participate in the formulation of the disputed policy. *Id.* at 881. In *Albright,* the court used these same factors in deciding that no state action existed. 884 F.2d at 841.

By contrast, in *Jatoi,* the Fifth Circuit found a nexus between the hospital authority and the private manager's decision to terminate a doctor's staff privileges that was close enough to justify a finding of state action. 807 F.2d at 1221–22. *Jatoi* is distinguishable from *Albright* and *Greco.* First, in *Jatoi,* the repayment of the bonds used to build the hospital was directly linked to and entirely dependent on the successful operation of the hospital. 807 F.2d at 1221. Thus, a financially interdependent relationship existed between the hospital and the hospital authority. *Id.* Second, Jatoi involved national origin and alienage discrimination. *Id.* Third, although the hospital authority had no direct daily input into the operation of the hospital, it was informed of decisions, including the decision to terminate Dr. Jatoi's privileges, and it monitored the lessee's activity and retained the ability to prevent or control racial discrimination by its private manager. *Id.* at 1221–22. Fourth, the hospital authority was a specially-created government entity that existed for the purpose of overseeing the hospital's activities; no such functional intermediary was present between the hospital and the county in either *Albright* and *Greco.* 884 F.2d at 840.

■ Guided by this authority, we must now "sift the facts and weigh the circumstances" here to determine whether the Hospital's termination of Cole involved state action. *Weaver v. AIDS Serv. of Austin, Inc.,* 835 S.W.2d 798, 801 (Tex.App.—Austin 1992, writ denied) (citing *Burton v. Wilmington Parking Auth.,* 365 U.S. 715, 722, 81 S.Ct. 856, 860, 6 L.Ed.2d 45 (1961)).

The Walker County Hospital District was created in 1971. Thus, the District, a specially-created governmental entity, is the functional intermediary between the county and the Hospital. *Albright,* 884 F.2d at 840. The statute was amended in 1977 to provide:

> The District, through its Board, is further authorized to enter into an operating or management contract with any person regarding all or any of its hospitals ... and it may delegate to the manager the power to manage and operate such hospital ... and to employ and discharge employees or

appoint and remove doctors from the staff. . . .

Act of May 20, 1977, 65th Leg., R.S., ch. 527, § 1(d), 1977 Tex.Gen.Laws 1325, 1327.

Under this authority, the District entered a lease agreement with the Hospital, which is a nonprofit corporation. The Hospital is governed by its board of trustees selected under the Hospital's bylaws. Ralph Beaty, the Hospital's administrator, swore that the District did not enact or adopt the Hospital's bylaws or any of its policies and procedures.

The District owns the land and the building that house the Hospital, and the Hospital pays rent to the District. The Hospital's rent, paid from patient revenue, repays the District's bonds. Thus, the District derives a direct financial benefit from the Hospital because the repayment of its bonds depends on the successful operation of the Hospital. One of the grounds for terminating Cole was that his use of the facilities had a negative financial impact on the Hospital. That negative financial impact could affect the repayment of the District's bonds. The District and the Hospital are intertwined in a financially interdependent relationship. *Albright,* 884 F.2d at 840.

Evidence established that the District was not informed of the Hospital's decisions regarding its medical staff; that the District played no role in denying Cole's privileges; and that the Hospital did not inform the District of its June 28, 1990 decision to deny Cole's reappointment. However, the lease provides:

> The [Hospital] also recognizes that many of the covenants contained in this Lease . . . are designed to assure to the District that the New Hospital is operated in the manner contemplated by the Act. In order further to assure that the [Hospital] does not take any action inconsistent with such covenants, if it so desires, the District shall be entitled to have a representative of the District present at any meeting of the Board of Trustees of the [Hospital] at which significant matters concerning the operation or policies of the [Hospital] are to be discussed.

Beaty's affidavit states that while the lease authorizes the District to have a representa-

tive present at meetings of the board, the District's representative is not authorized to participate in choosing or retaining the Hospital's medical staff, such as Dr. Cole.

Under the lease, the Hospital is responsible for its daily operation. The lease obligates the Hospital to operate in an economical and efficient manner in line with standards generally acceptable for fully accredited hospitals. Evidence established that the district does not participate or have the right to participate in any way with the daily operation of the Hospital. However, the District retained some authority over the Hospital's management. Section 8.11 of the lease required the Hospital to submit a management plan for the District's approval, but no one contends the plan affects Dr. Cole's privileges.

We conclude that all but one of the *Greco* factors indicate that there was no state action. First, the Hospital was not accused of racial discrimination. This fact is significant because courts, following constitutional and legislative mandates, have construed the state action concept broadly when the goal was to cure racial discrimination, as it was in *Jatoi. Greco,* 513 F.2d at 879. They have construed the concept of state action more narrowly when, as in this case, there was no claim of racial discrimination. *Id.*

Second, there is no evidence that the Hospital paid only $1 a year in rent as in *Greco,* but whether the hospital pays a large or small amount of rent will not alone establish the required interrelationship. *Albright,* 884 F.2d at 841. Third, as in *Greco,* the Hospital, not the District, was ultimately responsible for the daily maintenance and operation of the facility. Fourth, as in *Greco,* there is no benefit to the District directly attributable to Dr. Cole's removal. The fifth factor in *Greco* is present, a nexus between the District's involvement with the Hospital and Dr. Cole's removal. As stated, the District relies on the Hospital to pay rent, which the District uses to repay bonds, and one ground for terminating Dr. Cole was his negative financial impact on the Hospital.

We consider the sixth factor in *Greco* to be especially important. Here, the District had

no power to change the Hospital's decision nor did it directly or indirectly participate in the decision to remove Dr. Cole. The same fact was declared to be "particularly poignant" in *Albright,* and led to the conclusion that there was no state action. 884 F.2d at 840.

We conclude that the court erred in determining that the Hospital's acts constituted state action. "[C]onstitutional standards are to be invoked only when it can be said that the State is *responsible* for the *specific conduct* of which the plaintiff complains." *Blum,* 457 U.S. at 1004, 102 S.Ct. at 2786 (second emphasis added). That is not the case here. Because there was no state action, appellants cannot prevail on their constitutional causes of action or their claim under 42 U.S.C. § 1983.

We sustain the Hospital's cross-point of error.

### Private statutory cause of action

Cole contends that the trial court erred in finding that a private cause of action does not exist under either the Texas Medical Practice Act, TEX.REV.CIV.STAT.ANN. art. 4495b (Vernon Pamph.1996), or the Hospital Licensing Act, TEX.HEALTH & SAFETY CODE ANN. § 241.101 (Vernon 1992 & Vernon Supp. 1996).

### A. The Hospital Licensing Act

Generally, the Hospital Licensing Act governs the issuance of licenses to hospitals and authorizes the Texas Board of Health to adopt rules and minimum standards relating to staffing of hospitals, patient care and transfers, and safety and sanitation. TEX. HEALTH & SAFETY CODE ANN. §§ 241.022–028 (Vernon 1992 & Vernon Supp.1996).

 Cole asserts a private cause of action exists under section 241.101 of the Act. This section relates to hospital staffing, records, and plan reviews and is found after the Act's enforcement provisions. The section provides:

(a) Except as otherwise provided by this section and Section 241.102, this chapter does not change the authority of the governing body of a hospital, as it considers necessary or advisable, to:

(1) make rules, standards, or qualifications for medical staff membership; or

(2) grant or refuse to grant membership on the medical staff.

(b) This chapter does not prevent the governing body of a hospital from adopting reasonable rules and requirements in compliance with this chapter relating to:

(1) qualifications for any category of medical staff appointments;

(2) termination of appointments; or

(3) the delineation or curtailment of clinical privileges of those who are appointed to the medical staff.

*(c) The process for considering applications for medical staff membership and privileges must afford each applicant procedural due process.*

(d) An applicant for medical staff membership or privileges may not be denied membership or privileges on any ground that is otherwise prohibited by law.

TEX.HEALTH & SAFETY CODE ANN. § 241.101 (emphasis added). Cole contends that section 241.101(c) affords him a separate due process cause of action.

Reviewing the enforcement provisions of the Act, we find the legislature, with limited exceptions, entrusted the enforcement of the Act to the Texas Board of Health and the Texas Department of Health. The Act authorizes the Department of Health to make any inspection or investigation necessary to assure compliance with or prevent a violation of the Act. TEX.HEALTH & SAFETY CODE ANN. § 241.051 (Vernon Supp.1996). The Department is authorized to deny, suspend, or revoke a hospital's license if it fails to comply with any provision of the Act or rule adopted. TEX.HEALTH & SAFETY CODE ANN. § 241.053 (Vernon Supp.1996). Moreover, the commissioner of health may issue emergency orders that the attorney general or the appropriate county or district attorney may enforce through a suit and injunctive relief. TEX. HEALTH & SAFETY CODE ANN. § 241.0531, 241.054 (Vernon 1992 & Vernon Supp.1996). Administrative penalties may be imposed by the Texas Board of Health and by the Com-

missioner of Health. Tex.Health & Safety Code Ann. §§ 241.058, 241.059 (Vernon Supp. 1996). A person operating a hospital without a license is subject to criminal liability. Tex. Health & Safety Code Ann. §§ 241.057 (Vernon 1992). This statutory framework shows the legislature's intent to allow administrative agencies to enforce the provisions of chapter 241.

■■■ There is one exception under the enforcement provision of the statute: the legislature expressly provided a private cause of action under section 241.056, which allows persons injured by a hospital's patient transfer policy to sue. Tex.Health & Safety Code Ann. § 241.056 (Vernon 1992 & Vernon Supp.1996). If a statute refers to a person, thing, or consequence, it excludes all others. *Estate of Padilla v. Charter Oaks Fire Ins. Co.,* 843 S.W.2d 196, 199 (Tex.App.—Dallas 1992, writ denied). By expressly granting a private cause of action to one class of persons, the legislature evidenced its intent not to grant a private cause of action to other classes of persons, such as Cole.

■■■ Cole argues that we should imply a cause of action under chapter 241. We disagree. We must construe a statute to give effect to the legislative intent. *Harris County Dist. Attorney's Office v. J.T.S.,* 807 S.W.2d 572, 574 (Tex.1991). When the legislature enacts a regulatory statute to protect a class of persons, it intends to create an enforcement scheme that will fully protect that class. *Litton Indus. Prod., Inc. v. Gammage,* 644 S.W.2d 170, 176 (Tex.App.—Houston [14th Dist.] 1982), *aff'd in part, rev'd in part on other grounds,* 668 S.W.2d 319 (Tex. 1984). Therefore, when the enforcement scheme fails to adequately protect the intended beneficiaries, it is the duty of the courts to imply a cause of action to effectuate the legislative purposes. *Id.* We may impute an implication to a statute only when it is obvious that the legislature intended the implication and no other interpretation can be gathered from the statute as written; implications are never permitted if they will add to or contradict the statute. *Williams v. Anderson,* 850 S.W.2d 281, 284 (Tex.App.— Austin 1993, writ denied) (citing *Massachu-*

*setts v. United N. & S.D. Co.,* 140 Tex. 417, 168 S.W.2d 226, 229 (1942)).

The Department of Health is authorized to deny, suspend, or revoke a hospital's license if it fails to comply with *any* provision of the Act. Tex.Health & Safety Code Ann. § 241.053. We conclude that only the Department is authorized to redress complaints under section 241.101(c). Any other interpretation of the statute would add to its overall framework.

The trial court did not err in finding no separate cause of action under the Hospital Licensing Act.

### B. The Texas Medical Practice Act

■■■ Generally, the Texas Medical Practice Act governs (1) the qualifications, powers, and duties of the Board of Medical Examiners, (2) the licensing of physicians, and (3) disciplinary actions by the board. Tex. Rev.Civ.Stat.Ann. art. 4495b §§ 2.01–4.14 (Vernon Pamph.1996).

The provision of the Act relied on by Cole provides:

The legislature makes the following declarations:

... [H]ospitals, institutions, programs, and state agencies or political subdivisions shall, however, be free to adopt reasonable rules, regulations, and requirements relating to qualifications for medical staff appointments, reappointments, termination of appointments ... so long as such rules, regulations and requirements are determined upon a reasonable basis, such as professional and ethical qualifications of the physician, upon standards that are reasonable, applied untainted by irrelevant considerations, supported by sufficient evidence, free of arbitrariness, capriciousness, or unreasonableness and do not differentiate solely upon the academic medical degree held by such physician.

Tex.Rev.Civ.Stat.Ann. art. 4495b § 1.02(9).

Similar to the Hospital Licensing Act, the Medical Practice Act is enforced through criminal penalties and through administrative regulation. The Act defines unlawful and prohibited practices and provides criminal penalties for a person practicing medicine in

violation of the Act. TEX.REV.CIV.STAT.ANN. art. 4495b, § 3.07 (Vernon Pamph.1996). The Act also defines the grounds for revocation and suspension of a license by the board, sets forth the charging and hearing process to be followed by the board, and lists the methods of discipline available to the board. TEX.REV.CIV.STAT.ANN. art. 4495b, §§ 4.01–4.12 (Vernon Pamph.1996). The Act also authorizes the attorney general to file an action to recover a civil penalty from a person in violation of the Act. TEX.REV.CIV. STAT.ANN. art. 4495b, § 4.126 (Vernon Pamph.1996).

Employing the same reasoning above, we find that the legislature did not intend a private cause of action under the Act. We find the trial court did not err by refusing to graft a private cause of action for Cole into the Act. *Williams,* 850 S.W.2d at 284.

 Cole also relies on a section under the heading "reporting and confidentiality requirements" that provides:

A cause of action does not accrue against the members, agents, or employees of a medical peer review committee or against the health-care entity from any act, statement, determination or recommendation made, or act reported, without malice, in the course of a peer review as defined by this Act.

TEX.REV.CIV.STAT.ANN. art. 4495b § 5.06(1) (Vernon Pamph.1996). We find that this provision grants a qualified immunity from liability to a hospital and the members of its medical peer review committee and does not grant a cause of action to doctors, such as Cole, complaining of the actions of that committee. This section offers a hospital or committee members who did not act with malice protection from suit under other causes of action. For instance, this provision could be asserted to avoid liability for slander, libel, or any number of causes of action that might be asserted by a doctor claiming he was damaged by committee actions.

The trial court did not err in finding that the Medical Practice Act does not afford Cole a private cause of action.

We overrule point of error two.

## The Doctors' Judgment

In point of error one, the Coles contend that the trial court erred in striking their pleadings against the other defendants (collectively, the Doctors) for discovery abuse.

On June 18, 1991, the Doctors served interrogatories on the Coles, and the Coles filed answers to the interrogatories. However, in October 1991, the Doctors filed a motion to compel more complete interrogatory answers. There is no evidence that the motion was presented to the trial court for a ruling.

In December 1991, the Doctors filed motions to compel Cole to produce documents requested in a subpoena duces tecum that directed Cole to produce documents at his deposition. The Doctors contend the trial court orally ordered the Coles to produce requested documents; the Coles, however, dispute the order.

In March 1992, the Doctors filed motions to compel answers to interrogatories, answers to deposition questions, production of documents requested in Cole's deposition subpoena, production of documents on damages, designation of experts, and a deposition date for Mrs. Cole. The Doctors contend the trial court orally ordered the Coles to produce all responsive documents by March 23, 1992, or they would be excluded at trial. This oral order is referenced in the trial court's final dismissal order, and acknowledged by the Coles.

In June 1992, the Doctors filed a motion for oral hearing on all pending motions to compel answers to interrogatories and production of documents supporting those answers. On July 7, 1992, the trial court signed an order compelling the Coles to completely answer the interrogatories by August 1, 1992, or their pleadings would be stricken. The trial court also ordered the Coles to pay $250 in attorney's fees. There is no evidence in the record that the Coles complied with the order by paying the attorney's fees or by supplementing their interrogatory answers. In their brief, the Doctors assert the Coles did neither.

On September 2, 1992, the Doctors filed an unverified motion for sanctions and a motion

to compel production of documents responsive to a subpoena duces tecum served on Cole's accountant and production of all other discovery requested. The motion contended that the Coles' accountant, Donald Booker, produced documents at his deposition on June 19, 1992 but that the Doctors did not receive copies of all the documents produced at the deposition. The motion asked the trial court to order production of all documents related to the claims in the lawsuit, including (1) financial information, (2) all documents produced at Booker's deposition and responsive to his subpoena, (3) all other documents responsive to discovery requests, and (4) all documents relating to legal expenses included in the Coles' damage calculation.

The Coles responded to the Doctors' motion to compel and for sanctions. Attached to their response is the affidavit of their accountant who averred that he produced all documents relating to the Coles at his deposition, that Nightrider Copy Service copied and returned the documents, but that Lawyers Filing Service removed a large box of documents that had not been returned. Also attached to the response is the affidavit of the Coles' attorney, who stated that at the deposition he never saw a document that the Doctors contend was produced but not copied. Neither affidavit addresses the other complaints in the motion to compel.

On September 4, 1992, the trial court granted the Doctors' motion to compel and ordered the Coles to produce all documents "in any way related to the claims made in this suit including all financial and accounting records, all checks, bills, invoices, statements, notes, correspondence, etc., pertaining to the legal fees incurred on behalf of Plaintiffs in the matter and any other documents relevant to the issues before this Court." The order directed the Coles to produce the documents within 10 days from the date of the order or suffer dismissal of their causes of action.

On September 17, 1992, the Doctors filed a motion to enforce the dismissal sanction. Attached to the motion is the affidavit of the Doctors' attorney and excerpts from the accountant's deposition. On September 25, 1992, the Coles filed a motion for protective order asking the court to direct the Doctors

to withdraw their request for medical and billing records or to provide an advance deposit to cover the cost of copying and redacting the documents. The trial court denied the motion.

On October 2, 1992, the trial court granted the Doctors' motion to enforce sanctions. The order struck the Coles' pleadings and dismissed the cause with prejudice. The trial court later denied the Coles' motion for new trial.

■■■■■ As long as sanctions imposed for failure to comply with discovery are within the authority vested in the trial court, they will not be overturned unless they constitute a clear abuse of discretion. *Seckers v. Ocean Chem., Inc.*, 845 S.W.2d 317, 318 (Tex.App.—Houston [1st Dist.] 1992, no writ). The trial court's discretion in this area is broad. *Lawson v. Muckley*, 827 S.W.2d 484, 486 (Tex. App.—Houston [1st Dist.] 1992, writ denied). To establish a clear abuse of discretion, a party must show that the trial court's action was arbitrary or unreasonable in light of all the circumstances of the case. *Id.*

■■■■■ An imposition of sanctions for discovery abuse under TEX.R.CIV.P. 215 must be "just." *TransAmerican Natural Gas Corp. v. Powell*, 811 S.W.2d 913, 917 (Tex. 1991); *Berry–Parks Rental Equip. Co. v. Sinsheimer*, 842 S.W.2d 754, 757 (Tex.App.—Houston [1st Dist.] 1992, no writ); *Bair v. Hagans*, 838 S.W.2d 677, 680 (Tex.App.—Houston [1st Dist.] 1992, writ denied). Whether the sanction is "just" is measured by two standards: first, a direct relationship between the offensive conduct and the sanction imposed must exist; and second, the sanction imposed must not be excessive. *TransAmerican*, 811 S.W.2d at 917.

■■■■■ In exercising its discretion in choosing the appropriate sanction, the trial court is not limited to considering only the specific violation for which sanctions are finally imposed, but can consider everything that has occurred during the history of the litigation. *Berry–Parks Rental Equip.*, 842 S.W.2d at 757. As long as the sanction is "just," the rule leaves the choice of sanctions to the sound discretion of the trial court. *TransAmerican*, 811 S.W.2d at 917.

■ The record must reflect that the court considered the availability of lesser sanctions. *Otis Elevator Co. v. Parmelee,* 850 S.W.2d 179, 181 (Tex.1993). A permissible sanction should be no more severe than required to satisfy legitimate purposes. *Chrysler Corp. v. Blackmon,* 841 S.W.2d 844, 849 (Tex.1992); *F.N. Fausing Trading ApS v. Estate of Barbouti,* 851 S.W.2d 314, 318 (Tex.App.—Houston [1st Dist.] 1992, writ denied). However, case determinative sanctions may be imposed in the first instance in exceptional cases when they are clearly justified and it is fully apparent that no lesser sanctions would promote compliance with the rules. *GTE Communications Sys. Corp. v. Tanner,* 856 S.W.2d 725, 729 (Tex.1993).

■ Before a court may deprive a party of its right to present the merits of its case because of discovery abuse, it must determine that "a party's hindrance of the discovery process justifies a presumption that its claims or defenses lack merit." *Trans-American,* 811 S.W.2d at 918. If a party refuses to produce material evidence, despite the imposition of lesser sanctions, the court may presume that an asserted claim lacks merit and dispose of it. *Id.*

■ As a preliminary matter, the Doctors contend the Coles cannot show an abuse of discretion because the record does not contain a statement of facts from the September 4, 1992 sanctions hearing. However, the record shows that the September 4 hearing was not an evidentiary hearing. Moreover, the trial court's order states it relied on the pleadings and papers filed in support of the motion and on any oral argument of counsel. Thus, a statement of facts containing only the oration of counsel is not necessary on appeal. *Tilton v. Moye,* 869 S.W.2d 955, 957 (Tex.1994).

■ The Coles contend the trial court did not hear any evidence before imposing sanctions. When the trial court hears no evidence but expressly bases its decision on the papers filed and the arguments of counsel, there are no factual resolutions to presume in the trial court's favor. *Parmelee,* 850 S.W.2d at 181. In that instance, a reviewing court must look to the record to determine whether the case determinative sanctions imposed by the trial court are just under *TransAmerican. Id.*

■ The record shows that no evidentiary hearings were held on any of the motions to compel or for sanctions. There was no evidence presented to the trial court before it entered the July 1992 and September 4, 1992, sanctions orders. However, before it enforced death penalty sanctions, the trial court had the affidavit of the Doctors' counsel, evidencing the Coles' discovery abuse. The Coles did not file any controverting affidavit or present other evidence in response to the motion to enforce sanctions.

The trial court's October order striking the Coles' pleadings sets forth the Coles' discovery abuses, which were its reasons for imposing the case determinative sanctions. First, the court found that the Coles did not produce documents after they were ordered to do so by March 23, 1992. The March order directed the Coles to produce the documents by March 23, 1992, or they would not be allowed to use them at trial.[1]

The affidavit of the Doctors' attorney states that after the issuance of the March order, the Coles produced many documents. Relying on representations made by the Coles' attorney, she believed that document production was complete up to that time. Once the deposition of the Coles' accountant began, she realized that the Coles' had not produced financial documents previously requested and related to the Coles' damage claims. She notified opposing counsel of the missing documents, and he indicated that the Coles would comply. When the Coles did not produce the promised documents, she filed the September motion to compel and for sanctions. When counsel received more documents on September 14, 1992, she again realized that documents that had been ordered produced had not been. The Coles did

---

1. In their brief, the Coles acknowledge the March 20, 1992 oral order and the trial court's ruling: "[t]he trial court ruled (quite reasonably) that anything not located and produced would not be admitted into evidence." Therefore, we find the order to be valid. *See Tate v. Commodore County Mut. Ins. Co.,* 767 S.W.2d 219, 221–22 (Tex.App.—Dallas 1989, writ denied).

not present any controverting evidence. This evidence supports the trial court's finding that the Coles abused the discovery process when they did not comply with the March 1992 order.

Second, the trial court cited the Coles' failure to comply with the subpoena duces tecum issued for their accountant's deposition. Again, counsel's affidavit is evidence in support of the trial court's finding. She states that the accountant originally produced voluminous documents at his deposition that were to be copied, the Coles delayed in producing documents reviewed at the deposition, and they simply did not produce others reviewed at the deposition.

Third, the trial court found the Coles failed to produce, when ordered to do so by September 14, 1992, financial records that had been requested both in discovery requests and in the subpoena served on Cole. Counsel's affidavit supports this finding of discovery abuse. She states that she called the Coles' attorney on September 14, 1992, to inquire about the documents that had not been produced. She received some documents that evening but found many documents still missing: a list of patients, all invoices to and correspondence with Medicare and Medicaid providers, all documents which support the Coles' financial statements and tax returns, and all complete professional income tax returns. She attached to her affidavit letters to the Coles' attorney seeking production of the documents. Counsel stated that without these documents, the Doctors could not prepare a defense.

Fourth, the trial court found that the Coles did not produce those documents by October 2, 1992, the date of the hearing to enforce the sanctions. Again, counsel's affidavit supports this finding. She states that after the September 14, 1992 deadline for production, she attempted to obtain documents from the Coles without success. Moreover, the affidavit of a paralegal working for the Coles' attorney states that the Coles did not produce the required documents to their attorney until about 5:15 p.m. on October 1, 1992.[2] The affidavit states the documents were not produced to the Doctors before October 2, 1992.

The record shows a pattern of discovery abuse. The Coles repeatedly failed to produce documents related to their claims and damages. The record indicates that the Coles did not produce documents after being ordered to do so in March 1992. They also did not comply with the trial court's July 1992 sanction order; there is no evidence that the Coles paid the $250 sanction for attorney's fees or supplemented their interrogatory answers as ordered. Their failure to comply with previous orders supports the case determinative sanctions. *See Tanner*, 856 S.W.2d at 729–30. The death penalty sanctions were not excessive.

The record shows a direct relationship between the Coles' conduct and the sanctions imposed. There is evidence that the Coles' failure to produce documents prejudiced the Doctors' ability to prepare a defense. During his deposition in October 1991, Cole stated that he had other documents responsive to the subpoena duces tecum in storage, but he had not finished collecting them. When his deposition resumed in March 1992, Cole stated that he did not want to exclude the possibility that other documents responsive to the subpoena existed because he had not been able to go to storage and "ferret out" them. When asked what efforts had been made to investigate and review the materials in storage, Cole responded "very little."

The affidavit of their attorney's paralegal, stating that the Coles did not deliver documents to their attorney until after 5:00 p.m. on October 1, 1992, also supports the finding that the Coles were responsible for not producing documents to the Doctors. There is no evidence that the Coles' attorney personally hindered the discovery process. At Cole's deposition, he stated that the warehouses that had not been searched would be investigated within two weeks and everything found would be produced. The Coles' refusal to produce material evidence support the presumption that their claims lack merit. *TransAmerican*, 811 S.W.2d at 918.

---

**2.** The affidavit is attached to the Coles' motion for new trial.

The Coles did not complain to the trial court that they were unable to comply with any discovery requests or orders until September 25, 1992, when they filed their motion for protection. This was after the trial court entered its September 4 order directing the Coles to produce documents by September 14 or have their pleadings stricken. The Coles' contention on appeal, that the trial court's orders were not clear, was not raised in the trial court or presented for a ruling. TEX.R.APP.P. 52(a).

We find the record supports a finding that the trial court's imposition of case determinative sanctions against the Coles was just.

We overrule point of error one.

In a supplemental point of error, the Coles contend that the trial court's orders are void because "most of the proceedings in this case, including the dispositive hearings, were held and judgment rendered in the courtroom of the 164th District Court in Harris County, Texas."[3]

 The Coles assert that, although they did not object to the location of any proceeding, the trial court fundamentally erred. Fundamental error is a discredited doctrine. *Haney v. Purcell Co.*, 796 S.W.2d 782, 787 (Tex.App.—Houston [1st Dist.] 1990, writ denied). It exists "in those rare instances in which the record shows the court lacked jurisdiction or that the public interest is directly and adversely affected as that interest is declared in the statutes or Constitution of Texas." *Wal–Mart Stores, Inc. v. Alexander*, 868 S.W.2d 322, 328 (Tex.1993) (quoting *Pirtle v. Gregory*, 629 S.W.2d 919, 920 (Tex. 1982)). The record must "affirmatively and conclusively" disclose such error. *Haney*, 796 S.W.2d at 787.

 The record affirmatively shows that the order granting summary judgment and the final judgment signed by Judge Smith were filed of record in Walker County. The record does not show that Judge Smith rendered or signed the final judgment or interlocutory order granting summary judgment in Harris County instead of Walker County. *See Phagan v. State*, 510 S.W.2d 655, 663

(Tex.Civ.App.—Fort Worth 1974, writ ref'd n.r.e.) (holding no error because the record did not show the judgment was "rendered and signed" in a different county).

The record shows that on October 2, 1992, a hearing was held on sanctions, at which only argument of counsel was heard. At the conclusion, the judge stated, "I am going to" grant the motion and dismiss claims against the doctors. The final judgment mentions that hearing, stating that the judge struck the pleadings and dismissed those claims.

Appellants do not state what hearings they now object to or cite to any page of the record in which fundamental error occurred. We decline to search the record, which consists of 12 volumes of transcript, covering 2248 pages, for fundamental error. The record of the October 2 hearing identifies Judge Smith as the visiting judge of the 164th District Court and the presiding judge over this cause in the 278th District Court of Walker County, and it is styled "in the District Court of Walker County, 278th Judicial District." It identifies the court reporter, M.H. Edwards, as the "official court reporter in and for the 278th Judicial District Court of Walker County...." The record does not state where the hearing was held. Thus it does not affirmatively and conclusively establish error. *Haney*, 796 S.W.2d at 787.

We overrule the supplemental point of error.

We affirm the judgment.

WILSON and HEDGES, JJ., also sitting.

---

3. This lawsuit was filed in the 278th District Court, Walker County, Texas. Judge Bradley

Smith was assigned the lawsuit as a visiting judge.