**TENET HEALTH LTD., d/b/a Brownsville Medical Center, Appellant,**

v.

**Jose ZAMORA, M.D. and Carlos Chavez, M.D., Appellees.**

No. 13–99–572–CV.

Court of Appeals of Texas, Corpus Christi.

Feb. 10, 2000.

Rehearing Overruled March 16, 2000.

---

26. 883 S.W.2d 650 (Tex.1994).

27. 996 F.Supp. 641, 656 (S.D.Tex.1998).

28. *Id.*

Charles Walker Bailey, Donald P. Wilcox, Austin, for amicus curiae.

Daniel M. McClure, Houston, Katherine D. Mackillop, Fulbright & Jaworski, Houston, Roger W. Hughes, Ferriel C. Hamby, Jr., Will Hughs, Adams & Graham, Harlingen, W. Wendell Hall, Fulbright & Jaworski, San Antonio, for appellant.

Ruben R. Pena, Harlingen, Ray R. Marchan, Eddington & Associates, Brownsville, Jan Thurman, Thurman & Andres, Dallas, Charles W. McGarry, Albert E. Andres, Staci Glenn, Dallas, for appellants.

Before Justices DORSEY, CHAVEZ, and RODRIGUEZ.

## OPINION

Opinion by Justice DORSEY.

Tenet Healthcare, Ltd., d/b/a/ Brownsville Medical Center ("the hospital"), appellant, has offered its patients a cardiovascular surgery program since 1993. Over the past several years, the program became troubled. In 1998, it experienced what the hospital calls a "surge of deaths." Its mortality rate was 11%, compared to the national average of 3%.

After hiring an outside consultant to study the problem in 1999, the hospital retained an experienced cardiovascular surgeon, Dr. Louis Elkins, and entered into an exclusive provider contract with him. Under the terms of this contract, Elkins would serve as the "exclusive provider" of cardiovascular surgery services at the hospital, and only he and his employees, partners, or independent contractors under contract with him could provide cardiovascular surgery services at the hospital. This would put the responsibility and control for all cardiovascular surgery with one person, as had been recommended by the consultant. The hospital notified all cardiac surgeons practicing at the hospital of the new arrangement.

Drs. Zamora and Chavez (collectively "Zamora"), appellees, are surgeons who had "staff privileges" at the hospital, including privileges in the cardiovascular surgery program, for a number of years at the time the exclusive contract was entered into. Zamora contends that the exclusive provider contract would effectively diminish his own hospital "privileges" with respect to cardiovascular surgery. Accordingly, he contends that before his privileges were reduced, he was entitled to a hearing under the hospital bylaws and under Texas Health & Safety Code Ann. § 241.101(c) (Vernon Supp.2000). He filed suit seeking, among other things, injunctive relief requiring the hospital to allow him to continue practicing cardiovascular surgery at the hospital. On August 27, 1999, the trial court entered such an order. From this temporary injunction, the hospital appeals.

### The By–Law Provisions

The Bylaws of Brownsville Medical Center is a document that sets forth the terms between the "medical staff" and the hospital administrator and board of directors (herein "hospital management"). "Medical staff" is defined as "all duly licensed physicians ... holding current Texas licences, who are privileged to attend patients in

the hospital." The bylaws state that "membership on the medical staff of Brownsville Medical Center is a privilege which shall be extended only to professionally competent physicians, dentists and podiatrists who continuously meet the qualifications, standards and requirements set forth in the bylaws." The qualifications for membership on the medical staff include maintenance of a current license to practice medicine, agreement to abide by the American Medical Association's principles of medical ethics and maintenance of medical malpractice insurance.

The purposes of the "medical staff organization" are:

1. To insure that all patients admitted to or treated in ... the hospital shall receive a high quality of care;

2. To insure high level of professional performance ... in the hospital through the appropriate delineation of the clinical privileges that each practitioner may exercise in the hospital, and through an ongoing review and evaluation of each practitioner's performance in the hospital;

3. To provide an appropriate educational setting ...;

4. To initiate and maintain rules and regulations for self-government of the medical staff; and

5. To provide a means whereby issues concerning the medical staff and the hospital may be discussed by the medical staff with the [hospital management].

Appointments and reappointments to the medical staff are done by the hospital management, but only after there has been a recommendation from the medical staff. The bylaws also set forth at length the qualifications for and privileges held by various categories of "medical staff," and the procedures for applying for medical staff privileges.

The medical staff is divided into active, provisional, courtesy, senior and honorary medical staff. Every doctor practicing at the hospital, whether medical staff or not, must be granted "clinical privileges" in the specific areas of practice in which the doctor desires to practice. The doctor has to provide evidence that he is competent to practice in the clinical areas in which he seeks privileges, and the hospital must approve the clinical privileges. Temporary and emergency privileges may be granted, as well.

Under Article VII of the bylaws, corrective action may be instituted against any medical staff member when his activities or professional conduct fall below the standards of the medical staff, are detrimental to patient safety or to the delivery of quality patient care, or are disruptive to hospital operation. Corrective action may be initiated by any officer of the medical staff, by the chairman of any department, by the administrator of the hospital or by the board of directors. Varying levels of corrective action are set forth, and provisions are included to provide notice to the target of a corrective action and the procedure for administering the corrective action.

Finally, the bylaws provide for hearing and appeal procedures. The purpose of a hearing is "intra-professional resolution of matters bearing on professional competency or conduct." This section applies only to doctors who already have medical staff or other privileges, not to applications for new appointments. It allows a practitioner to request a hearing when one of the following occurs:

1) denial of requested advancement in medical staff membership;

2) denial of medical staff reappointment;

3) demotion to lower staff category;

4) suspension of medical staff membership;

5) expulsion from medical staff membership;

6) reduction in privileges;

7) suspension of privileges;

8) termination of privileges; and

9) denial of increase in privileges.

The procedure for such a hearing is also set forth in detail. The person requesting the hearing must be in attendance and may not have an attorney present. Both sides have the opportunity to present evidence, but formal rules of evidence are not followed. The matter is decided by the "hearing committee," which is a group of at least five appointed members of the active medical staff. An appeal is allowed on the grounds of either (1) substantial failure to comply with the procedures contained in the bylaws which denied a fair hearing, or (2) arbitrary or capricious action.

The remainder of the bylaws relates to committee appointments, qualifications, termination of appointments to certain positions, and other general provisions.

### Zamora's Lawsuit

Zamora filed suit against the hospital seeking damages and injunctive relief. All his causes of action arose from the hospital's actions in entering the exclusive contract agreement with Dr. Elkins. Specifically, he claims that (1) the hospital breached the contract created by the bylaws entitling him to a hearing before his privileges may be reduced; (2) the hospital denied him procedural due process as mandated by TEX. HEALTH & SAFETY CODE ANN. § 241.101(c).

### The Trial Court's Order

The trial court ordered the hospital to desist and refrain from preventing Zamora from practicing cardiovascular surgery at the hospital until judgment is rendered. The hospital was expressly allowed to make reasonable rules and specify procedures to facilitate operations at the hospital, but was ordered to "desist and refrain from adopting, implementing or enforcing procedures, rules and regulations which do not afford the Plaintiff physicians the same rights of access and schedule as those rights afforded any other physician practicing cardiac surgery, until judgment ... is rendered...." Finally, the injunction states that it "shall not alter the terms of the Medical Staff Bylaws or the rights and obligations of Dr. Zamora and Dr. Chavez and the Hospital thereunder, including without limitation the Hospital's right to take action reducing, modifying or terminating privileges as set forth therein."

### Standard of Review

To be entitled to an injunction, a plaintiff must show (1) that a wrongful act occurred (*i.e.,* that the plaintiff has a cause of action against the defendant); (2) that the plaintiff will likely succeed on the merits of his cause of action; and (3) that the plaintiff will likely suffer harm. *Garcia–Marroquin v. Nueces County Bail Bond Bd.,* 1 S.W.3d 366, 375 (Tex.App.—Corpus Christi, 1999, no pet. h.); *Walling v. Metcalfe,* 863 S.W.2d 56, 57 (Tex.1993). The "probable harm" element has three components. The plaintiff must show that the harm is imminent, that the injury would be irreparable, and that the plaintiff has no other adequate legal remedy. *Garcia–Marroquin, id.*

We review the grant or denial of a temporary injunction for abuse of discretion, which the trial court commits when it either acts arbitrarily and unreasonably, without reference to guiding rules or principals, or misapplies the law to the established facts of the case. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). While abuse of discretion does not exist if the trial court heard conflicting evidence, and substantive, probative evidence appears in the record that reasonably supports the trial court's decision, *Davis,* 571 S.W.2d at 862, we will apply a de novo standard of review when the issue turns on a pure question of law. *See State v. Heal,* 917 S.W.2d 6, 9 (Tex. 1996); *Pegasus Energy Group, Inc. v. Cheyenne Petroleum Co.,* 3 S.W.3d 112, 120 (Tex.App.—Corpus Christi 1999, pet. den.); *accord State Farm Lloyds v. Kessler,* 932 S.W.2d 732, 735 (Tex.App.—Fort Worth 1996, writ denied). The appellate court is not obligated to give any particu-

lar deference to legal conclusions reached by the trial court. *Pegasus*, 3 S.W.3d at 120.

■ The resolution of this case turns on the question of whether the hospital was prevented by either the bylaws or state statute from entering the exclusive contract with Dr. Elkins. Because we hold that the hospital is legally entitled to enter into this agreement, we hold that Zamora has failed, as a matter of law, to show a likelihood of success on the merits of his case. Accordingly, we hold the trial court abused its discretion in granting the temporary injunction.

We first address whether the hospital's actions breached the bylaws. Several Texas courts have addressed these issues. The Texarkana court of appeals reached the issue in *Gonzalez v. San Jacinto Methodist Hosp.*, 880 S.W.2d 436 (Tex.App.—Texarkana 1994, writ denied). In that case, an anesthesiologist with staff privileges at San Jacinto Methodist Hospital brought suit against the hospital after it entered into an exclusive contract for anesthesiology services with another anesthesiologist. Gonzalez claimed that his own staff privileges at the hospital were worthless because of the exclusive contract with the other anesthesiologist. *Id.* at 439.

The court, however, held that the exclusive contract did not terminate or reduce Gonzalez' privileges as that concept was contemplated in the bylaws. The court stated that the hospital, through the bylaws, did not "guarantee work for any physician" nor did it "limit its rights to enter into exclusive contracts" and to generally conduct the business of the hospital. *Id.* The court explained:

> For example, if the Hospital chose to eliminate treatment of some specialty from the Hospital, the prior granting of staff privileges would not by implication prohibit the Hospital from making that business decision. While in the present case, the exclusive contract may have the effect of eliminating Gonzalez's work

in the Hospital, it does not reduce or alter his staff privileges as such.

*Id.* The court further reasoned that Gonzalez actually could still obtain work at the clinic:

> [He] still had full staff privileges if he worked under the doctor with the exclusive contract or if he himself obtained the exclusive contract with the Hospital at a later time. Under these circumstances, he could immediately work in the Hospital with no restrictions on the scope of his activities.

*Id.* at 440.

The court also noted that the context of the bylaws' procedural requirements indicates that its procedural requirements for reducing physician's privileges "do not involve matters of administrative decisions, but rather deal with matters of professional competence and ethical conduct." *Id.* The court found that "[t]hese procedures were not intended to cover cases in which a doctor's staff privileges have been affected by some administrative decision not directly involving that doctor." *Id.*Because the court found that for the purposes of whether the bylaws required a hearing, Gonzalez' privileges were neither terminated or reduced, the court held that Gonzalez was not entitled to a hearing under the bylaws. It explained:

> Gonzales is not entitled to a hearing because the underlying rationale for holding a hearing is not present. In other words, there is nothing to be considered in a hearing in this situation. His staff privileges remain intact, subject only to his ability to find a way to get employment in the Hospital. The purpose of such a hearing is not to override administrative decisions on the operation of the Hospital.

*Id.*

Four years later, the Tyler Court of Appeals reached the same conclusion. In *East Tex. Medical Ctr. Cancer Inst. v. Anderson*, 991 S.W.2d 55 (Tex.App.—Tyler 1998, pet. den.), Dr. Anderson claimed his

privileges were unfairly reduced by the Center's entering into an exclusive contract with another physician through which all doctors practicing at the Center would have to be employed. *Id.* at 58. He claimed that by entering the exclusive contract agreement, the Center breached its agreement with him that he would receive a hearing prior to reduction or termination of his privileges at the Clinic. *Id.* at 62. The Tyler court found that while the bylaws did constitute an agreement that was enforceable against the Clinic, as a matter of law, the Clinic's actions in entering the exclusive contract agreement did not breach that agreement. *Id.* at 63.

The court reasoned that the contract rights afforded under the bylaws were "for the purpose of maintaining competency in professional conduct and practice" by the Clinic's staff doctors. *Id.* "These procedures were not intended to cover cases in which a doctor's staff privileges have been affected by some administrative decision not directly involving [that doctor]." *Id.* The court held that the Clinic's entering into the exclusive contract agreement was not a challenge to Dr. Anderson's professional conduct nor an effort to remove him for cause. *Id.* Again, the court found that Anderson was not owed a hearing because the underlying rationale for a hearing was not present, noting that "[t]he purpose of such a hearing could not be to override administrative decisions regarding the operation of the Institute." *Id.*

We find the reasoning of the Tyler and Texarkana courts persuasive. We hold that the actions of Brownsville Hospital in entering the exclusive agreement with Elkins did not breach any agreement to provide a hearing to Zamora as a matter of law. We adopt the reasoning of the Texarkana and Tyler courts with respect to the issue of whether entering an exclusive provider contract constitutes a reduction in privileges for purposes of procedure mandated by the bylaws.

### Violation of Procedural Due Process Provided by Statute

Next, Zamora claims that the hospital's exclusion of him from exercising his privileges violates TEX. HEALTH & SAF. CODE ANN. § 241.101(c) (Vernon Supp. 2000). That statute reads:

> The process for considering applications for medical staff membership and privileges or the renewal, modification, or revocation of medical staff membership and privileges must afford each physician, podiatrist, and dentist procedural due process.

*Id.* Again, we hold that Zamora's privileges have not been renewed, modified or revoked. He is still *privileged* to practice medicine in the sense that he has the requisite credentials to practice at Brownsville Hospital, and if he was to affiliate with the exclusive provider, he would not be hindered from performing cardiovascular surgery there because he did not possess medical staff privileges. We hold that section 241.101 does not apply to the situation where a physician's medical staff privileges have been affected by the administrative decision of the hospital to enter into an exclusive provider agreement. *Cf. East Tex. Medical Ctr. Cancer Inst.,* 991 S.W.2d at 64 (finding no statutory violation because "the abolition of a medical staff under a reorganization plan of the [hospital] does not involve the consideration of an application for medical staff membership and privileges"). Moreover, at least one court has held that section 241.101(c) does not create a private cause of action on behalf of a physician for failing to grant "procedural due process" with respect to termination or reduction of privileges. *Cole v. Huntsville Mem. Hosp.,* 920 S.W.2d 364, 372 (Tex.App.—Houston [1st District] 1996, no writ). We express no opinion on that ruling because we find that Zamora's privileges were not reduced or terminated as contemplated by the statute.

Zamora also argues that the hospital's true purpose in entering the exclusive contract was not to further efficient hospital

administration, but rather was to exclude Zamora from practicing cardiovascular surgery. The trial court entered findings indicating it agreed with this contention. We find, however, that because the hospital had a legal right to enter into the exclusive contract with Dr. Elkins, its motivations in so doing are irrelevant. *Cf. Calvillo v. Gonzalez*, 922 S.W.2d 928, 929–30 (Tex.1996) (holding that where physician was a party to exclusive provider contract with hospital he could not be liable for tortious interference with prospective business relations because he had established as a matter of law a legal right to interfere with plaintiff's prospective relations, and improper motive is irrelevant). As the Texas Supreme Court has noted,

> Improper motives cannot transform lawful actions into actionable torts. Whatever a man has a legal right to do, he may do with impunity, regardless of motive, and if in exercising his legal right in a legal way damage results to another, no cause of action arises against him because of a bad motive in exercising the right.

*Texas Beef Cattle Co. v. Green*, 921 S.W.2d 203, 211 (Tex.1996) (internal quotations omitted). Accordingly, we hold that Zamora has shown no cause of action based on the hospital's improper motives in exercising its legal right to enter an exclusive contract with Elkins.

■■■ A hospital is not a mere hostery providing room and board and a place for physicians to practice their craft, but owes independent duties of care to its patients. *See Mills v. Angel*, 995 S.W.2d 262, 278 (Tex.App.—Texarkana 1999, no pet.) (detailing the basis for hospital liability, distinct from physician liability to patients); *see also Denton Reg. Med. Ctr. v. LaCroix*, 947 S.W.2d 941, 950 (Tex.App.—Fort Worth 1997, pet denied, dism'd by agmt.) (holding hospital liable for negligent policies regarding anaesthesia staff even though actual practitioners not negligent); *Air Shields, Inc. v. Spears*, 590 S.W.2d 574 (Tex.Civ.App.—Waco 1979,

writ ref'd n.r.e.) (holding hospital liable for minor child's blindness because of negligent policies and procedures regarding the administration of supplemental oxygen to premature infants). A hospital owes duties directly to its patients to provide appropriate and usable medical equipment, to keep its premises in a reasonably safe condition, to not negligently allow termination of medical care, to use reasonable care in formulating the policies and procedures that govern its medical staff and nonphysician personnel, to exercise reasonable care in the selection of its medical staff, and to periodically monitor and review the medical staff's competence. *Mills*, 995 S.W.2d at 267–68; *St. Luke's Episcopal Hosp. v. Agbor*, 952 S.W.2d 503, 508 (Tex.1997) (stating that a hospital has a duty to a patient to exercise reasonable care in the selection of its medical staff and in granting privileges to them).

■■■ Brownsville Medical Center was exercising its right to formulate the policies and procedures governing its medical staff in a competent manner when it elected to implement the exclusive provider program. It would be illogical to impose a duty to use reasonable care upon a hospital, but to deprive the hospital of the ability to implement policies and programs that it deems reasonable. We hold that entering an exclusive contract such as the one in this case is a valid exercise of a hospital's administrative discretion. We agree with the hospital that if each and every decision that affected a physician's practice were deemed to "revoke" or "modify" staff privileges, a hospital could make precious few decisions without becoming mired in hearings. Any hospital decision to eliminate a program, shut down an operating room, cease offering a medical service, or enter into an exclusive contract could require hearings.

Additionally, we note that revoking or limiting a physician's hospital privileges has far different professional implications than entering into an exclusive contract which has the effect of excluding a physi-

cian from practicing a type of procedure. The granting or retention of a doctor's hospital privileges is a process known as "credentialing." *St. Luke's*, 952 S.W.2d at 505. Hospitals and physicians are not only encouraged to report professional incompetence on the part of other doctors, but in some instances, they are *required* to report it. Congress established the National Practitioner Data Bank, a national reporting system that tracks doctors' practice history and competency, and passed the Health Care Quality Improvement Act of 1986, 42 U.S.C. §§ 11101 et seq., for the purpose of improving the quality of medical care by encouraging physicians to identify and discipline other physicians who are incompetent or who engage in unprofessional behavior. *St. Luke's*, 952 S.W.2d at 514 (Cornyn, J., dissenting).

"Privileges" in the sense of "credentialing" and "privileges" in the sense of "a right to work in the hospital" are distinct notions. Accordingly, we distinguish between a direct reduction in privileges based on incompetent professional performance, and a hospital administrative decision that has the incidental effect of reducing a physician's ability to exercise his privileges. The bestowment of hospital privileges does not mean a physician has an unlimited right to practice medicine in a particular hospital, but rather that he is *qualified* to practice there according to the scope of the privileges.

Because we find that as a matter of law Zamora has not shown a probable right to recovery under these facts, we reverse the order of the trial court granting temporary injunction and remand this cause to the trial court for further proceedings consistent with this opinion.